## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| **Michael Lessner and Daniel Moore, individually and on behalf of all others similarly situated,**<br><br>**Plaintiffs**<br><br>**v.**<br><br>**CAMDEN NATIONAL BANK**<br><br>**Defendant.** | **Civil Action No. 2:25-CV-00109-KFW**<br><br>**DEMAND FOR JURY TRIAL** |

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Michael Lessner and Daniel Moore, individually, and on behalf of all others similarly situated (hereinafter "Plaintiffs") bring this Class Action Complaint against Defendant, Camden National Bank ("CNB" or "Defendant"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows.

## INTRODUCTION

1.     Plaintiffs bring this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing—without consent—the Nonpublic Personal Information[1] and Personally Identifiable Financial Information[2] (together, "Personal and Financial Information") of

---

[1] The United States Congress defines "nonpublic personal information" as "personally identifiable financial information-- (i) provided by a consumer to a financial institution; (ii) resulting from any transaction with the consumer or any service performed for the consumer; or (iii) otherwise obtained by the financial institution." The Gramm-Leach-Bliley Act, 15 U.S.C.A. § 6809(4)(A) ("GLBA").

[2] "Personally identifiable financial information means any information: (i) A consumer provides to [a financial institution] to obtain a financial product or service from [the financial institution]; (ii) About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or (iii) [a financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer." 16 C.F.R. § 313.3(o)(1).

1

Plaintiffs and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"), Facebook Events, Google, LLC ("Google"), Google Doubleclick Ads, Google Tag Manager, Google Analytics, Google Ads, Siteimprove, CallRail, Lotame, ReachLocal, Federated Media, Adobe Experience Manager, Adobe Audience Manager, Casale Media, Ilumin, Simpli.fi, Rubicon Project, Tapad, LinkedIn, Microsoft Adnxs, Altitude Digital, Flashtalking, RythymOne, and BidSwitch (collectively the "Third Parties") (in short, "the Disclosure").

2.      CNB's "digital products empower customers to bank anywhere at any time, including, but not limited to, online and mobile banking."[3] To provide these services, CNB operates and encourages its customers to use its website, https://www.camdennational.bank/ (the "Website"), on which customers can access its account information, access CNB's financial services, and apply for financial products like credit cards.

3.      Despite its unique position as a trusted credit union, CNB used its Website to blatantly collect and disclose Consumers'[4] and Customers'[5] (collectively, "Customers") Personal and Financial Information to Third Parties uninvolved in the provision of financial services—entirely without its knowledge or authorization. CNB did so by knowingly and secretly configuring

---

[3] *Id.*

[4] The term "consumer" means "an individual who obtains or has obtained a financial product or service from [a financial institution] that is to be used primarily for personal, family, or household purposes, or that individual's legal representative." 16 C.F.R. § 313.3; 15 U.S.C.A. § 6809(9).

[5] "Customer means a consumer who has a customer relationship with [a financial institution]." 16 C.F.R. § 313.3. The term "time of establishing a customer relationship" shall . . . in the case of a financial institution engaged in extending credit directly to consumers to finance purchases of goods or services, mean the time of establishing the credit relationship with the consumer." 15 U.S.C.A. § 6809.

and implementing code-based tracking devices ("trackers" or "tracking technologies") into its Website.

4.      Through these trackers, CNB disclosed and continues to disclose Personal and Financial Information that Customers input into and accessed on CNB's Website. This information includes, without limitation, information related to account applications, including the fact that a user was on a certain page, that users clicked certain buttons and what URLs or webpages it led to, their status as a customer, the type of bank account they were opening, and the Customer's business structure.

5.      Upon information and belief, CNB utilized data from trackers to improve and to save costs on its marketing campaigns, improve its data analytics, attract new customers, and generate sales. CNB benefited from use of Customers' Personal and Financial Information. CNB further allowed the Third Parties, who are uninvolved in CNB's provision of financial services, to profit from its Disclosure of Customers' Private and Financial information. And the Third Parties used Customers' Personal and Financial Information for itself and disclosed to fourth parties who also profited off of it. Facebook, for example, will use the data collected from Customers of CNB to sell ads to fourth parties who will profit off of the use of that information

6.      Customers like Plaintiffs and Class Members simply do not anticipate that a trusted financial institution will send its Personal and Financial Information to hidden Third Parties (who in turn share with fourth parties), all of whom profit off of it; likewise, when Plaintiffs and Class Members used Defendant's Website, they thought they were communicating exclusively with a trusted financial institution for the sole purpose of obtaining financial information and/or services.

7.      At no time did CNB disclose to Plaintiffs or Class Members that it was sharing its Personal and Financial Information with the Third Parties for third- and fourth-party use. Plaintiffs

and Class Members never signed a written authorization permitting Defendant to send their Personal and Financial Information to the Third Parties who were uninvolved in the provision of financial services.

8.      Defendant owed a variety of duties, including common law, statutory, contractual, and regulatory duties, to keep Plaintiffs' and Class Members' Personal and Financial Information safe, secure, and confidential.

9.      Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Personal and Financial Information, Defendant assumed legal and equitable duties to those individuals to protect and safeguard their information from unauthorized disclosure.

10.     The statutory and regulatory duties CNB owed Customers include its obligations under federal law. For example, the GLBA requires that "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801. Under this federal law, financial institutions like CNB are explicitly prohibited from disclosing a Customer's Personal and Financial Information without sufficient advance notification and opt-out opportunity. 15 U.S.C. § 6801, *et seq*.

11.     CNB ignored all its duties and obligations, including the GLBA's requirements, by disclosing Customers' Personal and Financial Information without proper advance notification and opt-out rights as required under the GLBA.

12.     Examples of "Personal and Financial Information" included in the GLBA are indistinguishable from the types of information CNB disclosed to Facebook, Google, and others, including, among other things: (a) "[i]nformation a consumer provides to [CNB] on an application to obtain a loan. . . or other financial product or service"; (b) "[t]it fact that an individual is or has

4

been one of [CNB's] customers or has obtained a financial product or service from [CNB]"; (c) "information about [CNB's] consumer . . . disclosed in a manner that indicates that the individual is or has been [CNB's] consumer"; (d) "information that a consumer provides to [CNB] or that [CNB] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account"; "[a]ny information that a consumer provides to [CNB] or that [CNB] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and (e) "any information [CNB] collect[s] through an Internet 'cookie' (an information collecting device from a web server)." 16 C.F.R. 313.3(o)(2)(i).

13.    CNB breached common law, statutory, and contractual obligations to Plaintiffs and Class Members by, *inter alia*, (i) failing to adequately review its marketing programs and web based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to collect and share Personal and Financial Information; (iii) aiding, agreeing, and conspiring with the Third Parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose its Personal and Financial Information to Third Parties for Third Party and fourth party use; (v) failing to protect Personal and Financial Information and take steps to block the transmission of Plaintiffs' and Class Members' Personal and Financial Information through the use of tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of its customers' Personal and Financial Information.

14.    Plaintiffs seek to remedy these harms and brings causes of action of (I) Negligence; (II) Invasion Of Privacy; (III) Breach Of Express And Implied Contract; (IV) Unjust Enrichment (As Alternative To Contract Claims); (V) Bailment; (VI) Declaratory Judgment; (VII) Violation of

Maine's Confidential Financial Records Act; (VIII) Violation of the Electronic Communications Privacy Act ("ECPA"); (IX) Violation of the Electronic Communications Privacy Act (Unauthorized Divulgence by Electronic Communications Service); (X) Violation of Title II of the Electronic Communications Privacy Act ("Stored Communications Act"); and (XI) Violation of the Computer Fraud and Abuse Act ("CFAA").

15.    Plaintiffs bring this action, individually and on behalf of all others similarly situated, for damages and equitable relief.

## PARTIES

16.    Plaintiff Michael Lessner is a natural person and citizen of Maine, where he intends to remain. Plaintiff Lessner visited the website to apply for a credit card around 2019 or 2020 and as a result of that website visit is a victim of Defendant's unauthorized Disclosure of Personal and Financial Information.

17.    Plaintiff Daniel Moore is a natural person and citizen of Maine, where he intends to remain. Plaintiff Moore applied for a personal checking account from CNB in October 2024 and is a victim of Defendant's unauthorized Disclosure of Personal and Financial Information.

18.    Defendant CNB is a national banking association chartered under the laws of the United States and headquartered in Camden, Maine.[6]

19.    Simon R. Griffiths is CNB's President and Chief Executive Officer, with Principal Executive Offices located at 2 Elm Street, Camden ME, 04843.[7]

20.    CNB is a financial institution, as that term is defined by Section 509(3)(A) of the GLBA, 15 U.S.C. § 6809(3)(A).

---

[6] *2024 Annual Report.*
[7] *Id.*

21.     CNB has corporate offices in Camden, Maine, and maintains physical locations in the state of Maine.[8]

## JURISDICTION AND VENUE

22.     This Court has personal jurisdiction over Defendant because, personally or through its agents, Defendant operates, conducts, engages in, or carries on a business in this State, in at least fifty-six different physical locations; it maintains corporate offices in this state; and committed tortious acts in this state.

23.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs. Complete diversity exists between Defendant and at least one member of the proposed Classes, and there are more than one hundred (100) members in the proposed Classes.

24.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because them arises under the laws of the United States. The Court has supplemental jurisdiction over Plaintiffs' claims arising under state law pursuant to 28 U.S.C. § 1367.

25.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district and continue to occur in this district.

## COMMON FACTUAL ALLEGATIONS

### A.    CNB: A DOMINANT FINANCIAL INSTITUTION THAT COLLECTS PERSONAL AND FINANCIAL INFORMATION UNDER THE GUISE OF PROTECTING IT

26.     CNB services its customers through its "online and mobile banking…easy-to-use online platform for consumer borrowers… our online load application system with instant

---

[8] *Id.*

approval…[and] our secure online platform" because "[c]hannels for servicing our customers are evolving rapidly, with less reliance on traditional branches [and] more use of online and mobile banking."[9] CNB's website allows Customers to "[a]ccess your accounts 24/7 with digital banking."

27.    CNB proclaims it "respect[s] your privacy and [is] committed to protecting it."[10]

28.    CNB portrays to its Customers, "[w]e understand how important it is to protect the privacy of those who visit this web site [] or who obtain products or services from us online through this Site."[11]

29.    Defendant serves its Customers via its "online and mobile banking," and encourages customers to use its Website to, for example, learn about CNB and its services,[12] view educational financial resources,[13] apply for and access personal checking and savings accounts,[14] apply for and access business checking and savings accounts,[15] bank online via digital banking tools,[16] and much more.

30.    Defendant encourages the comprehensive functionality and use of its Website in service of its own goal of increasing profitability. In furtherance of that goal, Defendant purposely

---

[9] *2024 Annual Report.*

[10] *See Online Services Privacy Policy*, https://www.camdennational.bank/online-services-privacy-policy (last visited Mar. 13, 2025) ("*OS Privacy Policy*") (attached as Exhibit A).

[11] *See Privacy Policies*, https://www.camdennational.bank/privacy-policy (last visited Mar. 13, 2025) ("*Privacy Policies*") (attached as Exhibit B).

[12] *See About*, https://www.camdennational.bank/about (last visited Mar. 13, 2025).

[13] *See Business Smarts Archives – Financial Smarts*, https://camdennational.blog/category/business-smarts/ (last visited Mar. 13, 2025).

[14] *See Open a Personal Checking Account*, https://www.camdennational.bank/personal/bank/personal-checking (last visited Mar. 13, 2025).

[15] *See Small Business > Camden National Bank*, https://www.camdennational.bank/small-business (last visited May 29, 2025).

[16] *See Digital Banking*, https://www.camdennational.bank/personal/bank/digital-banking (last visited Mar. 13, 2025).

and secretly installed the Third Parties' online tracking technology onto its Website to gather and share information about Customers.

31.    CNB utilized the information it collected to market its services and bolster its profits by surreptitiously diverting the information to Third Parties like Facebook and Google.

32.    But Defendant did not only collect information for its own use; Defendant also shared—and continues to share—Customers' information, including Personal and Financial Information, with the unauthorized Third Parties who then use it for its own benefit and to benefit fourth parties who are even further removed from the Customers.

**B.    THIRD PARTIES AND TRACKERS: COLLECTORS AND PROFITEERS OF PERSONAL AND FINANCIAL INFORMATION**

33.    The invisible Third Party online tracking technologies installed by CNB on its Website gathers a vast assortment of Customer data. The installation of these trackers—and thus its transmission of data—is in CNB's exclusive control.

34.    When an individual accesses a webpage containing online tracking technology from a Third Party, the trackers instantaneously and surreptitiously duplicate communications with that webpage and send it to the Third Party. The information travels directly from both the user's browser and the webpage owner's server and then on to the Third Party's server, based off instructions from the Third Party's tracker. The communications and information transmitted via these trackers are entirely in Defendant's control; Customers trust CNB with the information it input on CNB Website, and CNB is in complete and exclusive control of its Website and the data input therein.

35.    Online tracking technologies may not be deleted from an individual's device; they are built into a webpage, and a webpage Customer has no control or warning over their presence or data collection. Third party trackers cause information to flow directly from the Customer's

browser and the website owner's server to the Third Party itself. A Customer cannot prevent or even detect this transmission of data.

36.    Accordingly, without any knowledge, authorization, or action by a user, a website owner who has installed Third Party trackers is utilizing website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Third Parties.

37.    In this case, Defendant employed the Third Party trackers to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Personal and Financial Information to the Third Parties contemporaneously, invisibly, and without the customer's knowledge.

38.    Consequently, when Plaintiffs and Class Members visited Defendant's Websites and communicated its Personal and Financial Information, that information was simultaneously intercepted and transmitted to the Third Parties.

39.    The Third Party trackers do not provide any substantive content on CNB's Website. Rather, its only purpose is to collect and share information to be used for the Third Party and fourth parties' marketing and sales purposes.

40.    The Facebook or Meta Pixel (which includes Facebook Events), for example, "tracks the people and type of actions they take" on a website.[17] It can be used to gather customer data, identify customers and potential customers, target advertisements to those individuals, and market products and services. This includes when a user visits a particular webpage, clicks a button, fills out a form (including the information from the form like the type of bank account they are opening), IP addresses, web browser information, page location, any custom events set by the

---

[17] *Retargeting*, Meta, https://www.facebook.com/business/goals/retargeting (last visited Aug. 11, 2024).

website owner, the tracker ID, and more.[18] Facebook does all of this by using the Meta Pixel to send "events" to its server.

41.    Once the data is collected via the Meta Pixel, Facebook aggregates it to build its own massive, proprietary dataset, which Facebook then uses to find new customers, drive sales, and understand ad impact. This is all to the benefit of the website owner, like CNB, Facebook as the third party, and other fourth parties, all of whom use the information for targeted marketing campaigns. Targeting works by allowing fourth parties to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[19]

42.    Upon information and belief, the Meta Pixels installed on CNB's website, including Meta Pixels with ID 139708746693879 ("Pixel1"), ID 274436996374325 ("Pixel2"), ID 1654094231389476 ("Pixel3"), and ID 1402476964028324 ("Pixel4"), collect data including the "c_user cookie," which enables Facebook to link the user to their logged in Facebook account and thereby identify the user.

43.    Data harvesting is big business for Facebook; it drives Facebook's advertising sales, which are its profit center. In 2023, Facebook generated nearly $135 billion in revenue, roughly 98% of which was derived in advertising revenue alone space.[20] This business model is not limited

---

[18] *See, e.g.*, *Meta Pixel*, Meta for Developers, https://developers.facebook.com/docs/meta-pixel/ (last visited Aug. 11, 2024); *Specifications for Facebook Pixel Standard Events,* Meta, https://www.facebook.com/business/help/402791146561655 (last visited Aug. 11, 2024); *see also Facebook Pixel, Accurate Event Tracking, Advanced*, Meta for Developers https://developers.facebook.com/docs/facebook-pixel/advanced/ (last visited Aug. 11, 2024).

[19] *Audience Ad Targeting*, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).

[20] *Meta Reports Fourth Quarter and Full Year 2023 Results*, Facebook https://investor.fb.com/investor-news/press-release-details/2024/Meta-Reports-Fourth-Quarter-and-Full-Year-2023-Results-Initiates-Quarterly-Dividend/default.aspx (last visited Aug. 8, 2024).

to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

44.    On information and belief, the trackers Defendant installed from other Third Parties, including Google, Siteimprove, CallRail, Lotame, ReachLocal, Federated Media, Adobe Experience Manager, Adobe Audience Manager, Casale Media, Ilumin, Simpli.fi, Rubicon Project, Tapad, LinkedIn, Adnxs, Altitude Digital, Flashtalking, RythymOne, and BidSwitch, work similarly to the Meta Pixel and likewise transmitted Plaintiffs' and the Class Members' Personal and Financial Information without Plaintiffs' and Class Members' knowledge or authorization.

45.    The Google trackers allow Defendant to track and share with Google (1) who uses CNB's Website; (2) whether the user is a customer of CNB, (3) what actions the user performs on the Website, such as what types of products the customer is viewing as well as the customer's selections on those pages; (4) when users visit the Website; (5) where on the website users perform these actions; and (6) how users navigate through the website to perform these actions. Google gathers this information using trackers embedded on CNB's Website and generates corresponding reports.[21] DoubleClick,[22] Google Tag Manager,[23] and Google Analytics[24] and Google Ads are used

---

[21] *See generally*, *A big list of what Google Analytics can & cannot do*, MarketLyrics, avail. at https://marketlytics.com/blog/list-of-things-google-analytics-can-and-cannot-do/.

[22] *See the DoubleClick Digital Marketing Suite,* Google Developers, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick (last accessed May 12, 2025).

[23] *See Your guide to Google Tag Manager*, GOOGLE SUPPORT, https://support.google.com/tagmanager/answer/12811173?hl=en (last accessed May 27, 2025).

[24] *See How Google Analytics works*, GOOGLE SUPPORT, https://support.google.com/analytics/answer/12159447?hl=en (last accessed May 27, 2025).

by Google to collect all of this. are part of the suite Google uses to collect all of this.[25] Google's collection of this data "enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[26] On information and belief, the data CNB sends to Google trackers CNB installed, which include Google Tag Manager container GTM1, Google Analytics tracker with ID G-9KD1BKW7K4 ("GA1"), Google Analytics tracker with ID UA-1395778-2 ("UA1"), and Google Analytics tracker with ID UA-21433360-1 ("UA2"), and Google Tag Manager container GTM1, include cookies which are used by Google to identify and track users across websites.

46.    On information and belief, Defendant used Adnxs, which is a Microsoft subsidiary tracker.[27] The Microsoft tracker allows Defendant to "[t]rack what your customers are doing after they click on your ad."[28] According to Microsoft, the tracker "records what customers do on your website . . . [and] will collect data that allows you to track conversion goals and target audiences with remarketing lists."[29]

47.    On information and belief, Defendant used the Siteimprove tracker. As Siteimprove states, "Siteimprove Analytics gives you powerful insights into visitor behavior and website

---

[25] *See the DoubleClick Digital marketing Suite,* Google Developers, https://developers.google.com/app-conversion-tracking/third-party-trackers/doubleclick (last visited Aug. 8, 2024).
[26] *See DoubleClick Digital Marketing,* Google Help, https://support.google.com/faqs/answer/2727482?hl=en (last visited June 26, 2024).
[27] *See AppNexus +Microsoft,* available at https://www.appnexus.com/sites/default/files/case-studies/Microsoft-Case-Study-FINAL.pdf (last visited Dec. 16, 2024).
[28] *Microsoft Advertising,* Microsoft.com, https://about.ads.microsoft.com/en/tools/performance/conversion-tracking#:~:text=Universal%20Event%20Tracking%20(UET)%20is,target%20audiences%20with%20remarketing%20lists (last visited June 26, 2024).
[29] *Id.*

13

performance with intuitive dashboards and easy-to-use reporting, so you can make data-driven decisions to consistently deliver business results across teams."[30]

48.     On information and belief, Defendant used CallRail, which is software that helps entities like Defendant determine the marketing channels that generate more calls.[31] CallRail can integrate with Google Analytics to analyze the effectiveness of a website owner's landing pages so the business can determine its most successful leads and conversion rate.[32]

49.     On information and belief, Defendant used the Lotame tracker. The Lotame tracker "connect[s] customer data… across channels" to "power smarter, faster, easier advertising."[33] Lotame's services include "[i]dentity [r]esolution," meaning that it links data from different sources to identify website users.[34] Lotame "partner[s] with all major players across adtech, social, CTV, and more," connecting data from over 100 companies including Facebook and Google.[35]

50.     On information and belief, Defendant used ReachLocal, which connects information "from all platforms, [including] Facebook, Instagram, your website, [and] google," specifically to "drive more business."[36]

---

[30] *See Siteimprove*, https://www.siteimprove.com/platform/analytics/ (last acc. Nov. 18, 2024).
[31] Anthony Milia, *What is CallRail?* MILIA MARKETING (Mar. 24, 2024), https://miliamarketing.com/what-is-callrail/#:~:text=Callrail%20software%20helps%20a%20company,forms%20of%20digital%20marketing%20campaigns. (last visited Oct. 31, 2024).
[32] *Id.*
[33] *See Lotame | Addressable Audiences |Data Curation | Identity Solutions*, https://www.lotame.com/ (last visited May 29, 2025).
[34] *Id.*
[35] *Id; Partners | Lotame*, https://www.lotame.com/partner-connections/ (last visited May 29, 2025).
[36] *See ReachLocak.io | All-in-One CRM & Automation for Local Businesses*, https://reachlocal.io/ (last visited May 29, 2025).

51.    On information and belief, Defendant used the Federated Media tracker. This tracker is designed to collect and compile information across platforms to help businesses create targeted marketing campaigns and drive business.[37]

52.    The Adobe trackers, including Adobe Experience Manager and Adobe Audience Manager, can collect a veritable wealth on information on Defendant's Website, including page views, clicks, time on page, scroll depth, video views, form submissions, user demographics and interests, social media interactions, email subscriptions, purchases, search behavior, custom data (collected directly from the website, like customer IDs, email addresses, and purchase history), and other third-party data.[38]

53.    On information and belief, Defendant used the Casale Media tracker. "Casale Media Online Advertising Exchange…uses cookies for the purpose of tracking when an Internet user has seen an advertisement…[and] may obtain data from third party companies for the purpose of informing ad selection." Casale Media assigns "unique user identification number" for each user it tracks.[39]

54.    On information and belief, Defendant used the Ilumin tracker. This tracker "monitor[s] your customers for you" and connects the data it collects with a "[l]arge number of data sources."[40]

---

[37] *See Federated Media – New Ideas…Old Values*, https://www.federatedmedia.com/ (last visited May 29, 2025); *Federated Media Tracker,* FEROOT, https://www.feroot.com/trackers-database/federated-media/ (last visited May 29, 2025).
[38] *See Audience Manager Benefits*, Adobe, https://business.adobe.com/products/audience-manager/benefits.html (last visited Aug. 8, 2024)
[39] *See casalemedia.com*, http://www.casalemedia.com/(last visited May 29, 2025).
[40] *See Illuminani: Put your FINTRAC compliance on auto-pilot*, https://www.ilumin.ai/ (last visited May 29, 2025).

15

55.    On information and belief, Defendant used Simpli.fi trackers. Simpli.fi is a "software management solution[]" that "[]combin[es] cross-channel capabilities with a full suite of targeting tactics" including "custom precision targeting."[41]

56.    On information and belief, Defendant used the Rubicon Project tracker.[42] This tracker helps businesses target audiences by partnering and sharing data with some of the largest media companies.[43]

57.    On information and belief, Defendant used the Tapad tracker. Tapad "enables marketers to identify a brand customer or related household across multiple devices" which helps website owners to "maximize their digital marketing investment."[44]

58.    Furthermore, on information and belief, Defendant utilized LinkedIn trackers. "LinkedIn analytics is a collection of metrics that measure the effectiveness of your posts, updates and strategy on the platform. It's statistical data that enhances your LinkedIn marketing efforts."[45] Like the Google trackers, the LinkedIn trackers record events that include data such as users' IP addresses, cookies, and browser fingerprints, which include information such as the browser version, screen resolution, device type, processor architecture, and other identifying characteristics, which information can be used to identify specific users.

---

[41] *See Media Buying Solution*, https://simpli.fi/our-solutions/media-buying-solutions (last visited Dec. 16, 2024).

[42] The Rubicon Project is now known as Magnite, which it merged with in 2020. *See Rubicon Project*, LINKEDIN, https://www.linkedin.com/company/the-rubicon-project, (last visited May 29, 2025).

[43] *See Magnite – The Largest Independent Sell-Side Advertising Company*, https://www.magnite.com/ (last visited May 29, 2025).

[44] *See Tadpad | Homepage*, https://www.tapad.com/ (last visited Apr. 9, 2025).

[45] SproutSocial, Rana Bano, March 5, 2024, *LinkedIn analytics: The complete guide for tracking metrics in 2024,* avail. at https://sproutsocial.com/insights/linkedin-analytics/ (last acc. Aug. 8, 2024).

59.     On information and belief, Defendant used the Altitude Digital tracker. Altitude Digital is designed to "streamline[] the connection between publishers and advertisers."[46]

60.     On information and belief, Defendant used the Flashtalking tracker. This device, tracking users across the internet, uses "device recognition" and "employs machine learning algorithms" to derive a "persistent ID" for each internet user it tracks.[47] Flashtalking "provide[s] advertisers with persistent identities for measurement and personalization."[48]

61.     On information and belief, Defendant used the RythymOne tracker.[49] This tracker is designed to collect information for marketing purposes.[50]

62.     On information and belief, Defendant used the BidSwitch tracker. BidSwitch connects data with its partners and supply platforms.[51]

63.     The collection and disclosure of users' data via these trackers occurs automatically.

### C.     CNB USED TRACKERS TO DISCLOSE PERSONAL AND FINANCIAL INFORMATION WITHOUT USERS' AUTHORIZATION

64.     On information and belief, CNB installed each of these trackers, through which CNB transmitted Customers' communications with CNB's website and thus its Personal and Financial Information to the Third Parties without Customers' knowledge or authorization. This information included their browsing activities including the pages they viewed and the buttons

---

[46] *See Altitude Digital*, LINKEDIN, https://www.linkedin.com/company/altitude-digital (last visited May 29, 2025).

[47] *See Identity Building Block 1:Ftrack | Innovid*, https://www.flashtalking.com/blog/2021/7/12/identity-building-block-1-ftrack (last visited May 29, 2025).

[48] *Id.*

[49] Now known as "Tremor" since being acquired by Tremor International in 2029. *See RhythmOne (RadiumOne) Tracker*, FEROOT.COM, https://www.feroot.com/trackers-database/rhythmone-radiumone/ (last visited May 29, 2025).

[50] *Tremor – We Get People Engaged*, https://www.tremor.com/ (last visited May 29, 2025).

[51] *See BidSwitch – Smart Infrastructure For The Global Programmatic Ecosystem*, https://www.bidswitch.com/ (last visited May 29, 2025).

they clicked; information revealed in the application process regarding (i) the products in which Customers were interested, (ii) the user's status as a CNB customer, and (iii) information about the Customer's account application, including, without limitation, the type of bank account they are opening and the Customer's business structure.

65.    On information and belief, since at least as early as January 1, 2010, and at least as recently as March 4, 2025, CNB has had tracking technologies installed on its Website.

66.    Accordingly, CNB disclosed its Customers'—including Plaintiffs' and the Class Members'—data and Personal and Financial Information to the Third Parties, like Facebook and Google, beginning at or before January 1, 2010, and at least up to March 4, 2025.

    i.    *CNB Historically Tracked and Disclosed Customers' Private and Financial Information*

67.    On information and belief, CNB's website at  https://www.camdennational.bank went live between December 31, 2021 and June 25, 2022. Prior to that, the website was hosted at https://www.camdennational.com. On information and belief, since at least January 1, 2020, CNB installed various online trackers on its operative website which tracked and disclosed Customers' Private and Financial Information.

68.    By way of example, at least as early as January 1, 2010, CNB installed a Google Analytics    tracker    with    ID    UA-1395778-2    ("UA1")    on    the    website    hosted    at https://www.camdennational.com..

69.    By February, 23, 2011, CNB replaced UA1 with a Google Analytics tracker with ID UA-21433360-1 ("UA2").

70.    By October 22, 2015, CNB added Google Doubleclick Ads.

71.    The next changes came around February of 2018 when CNB added the Google Tag Manager container GTM1 and a Meta Pixel with ID 139708746693879 ("Pixel1").

72.     Then by the end of August, 2019, CNB had added a second Meta Pixel with ID 274436996374325 ("Pixel2").

73.     On information and belief, when CNB migrated to its new domain at https://www.camdennational.bank, CNB installed trackers. By way of example, on information and belief, at least as early as June 25, 2022, CNB installed Pixel1, Pixel2, UA2, and Google DoubleClick Ads on its new domain. The code for GTM1 was also present at that time.

74.     By July 1, 2022, CNB had added the Google Analytics tracker with ID G-9KD1BKW7K4 ("GA1").

75.     By August 7, 2022, CNB activated GTM1.

76.     Next, in late March 2023, CNB removed Pixel1 and Pixel2 from its website source code; however, other Meta Pixel code remained. It is reasonable to believe CNB moved its Meta Pixels to GTM1.

> *ii.    Present Day Tracking*

77.     On information and belief, CNB begins its disclosures about users when users arrive on CNB's home page.

78.     As soon as a user arrives on the homepage, CNB reports to Google, LinkedIn, Facebook, and Siteimprove that the user is on the page, "camdennational.bank."

79.     When users continue to CNB's personal checking and business checking applications, CNB continues to disclose information about users' activities to third parties.

> **a.  Personal Checking Application**

80.     On information and belief, CNB discloses users' progress as they navigate CNB's personal checking application to third parties. CNB also informs third parties the name of the bank accounts for which users are applying.

19

81.     Upon a user's click to open a personal checking account, CNB transmits events to LinkedIn and Siteimprove reporting that the user clicked for "personal/bank/personal-checking."



82.     Then as the next page loads, CNB informs Google, LinkedIn, and SiteImprove that the user is now on another page to "Open a Personal Checking Account at Camden National Bank" located at the URL "https://camdennational.bank/personal/bank/personal-checking."

83.     As the user navigates to the next step, CNB informs LinkedIn and Google about this and also informs them about the specific type of bank account that the user is interested in opening.

84.     For example, when the user clicks to open a Cash Bank Rewards account, CNB informs LinkedIn that the user clicked a button labeled "Open today" to "Open a Personal Checking Account at Camden National Bank" called "Cash-back rewards."



85.     Moreover, CNB also informs Google that the user is viewing a page to "Open a Personal Checking Account at Camden National Bank." Additionally, CNB informs Google that the user is applying for a consumer deposit checking account named "Rewards Checking."

86.     CNB also reports to Siteimprove that the user clicked to navigate to "https://www.camdennational.bank/personal/bank-personal-checking."

87.     Then, as the user navigates to begin the application form, CNB reports that action to Google, revealing that the user is "Getting Started" on the page, "https://apply.camdennational.bank/sales."



88.     Once the user arrives on the first page of the application where CNB requests basic personal information, CNB reports to Google that the user is on a page titled "Personal Info | Camden National Bank."

89.     As the user clicks to proceed to the next page of the form, CNB also reports that to Google, informing it that the user clicked to "checkout" for CNB's "Consumer/Deposit/Checking" "Rewards Checking."

90.    As the user continues their application, CNB informs Google that the user's "Rewards Checking" consumer deposit checking application is "in_progress."

91.    Finally, as the user completes the application, CNB reports to Google that the user is on the page, "sales/flows/consumer/confirmation."



b.  *Business Checking Application*

92. On information and belief, CNB similarly notifies third parties when users apply for business checking accounts, sharing information about users' progress through the application, the type of accounts they are applying for, and the business structure.

93. Upon a user's click to navigate to CNB's checking account application, CNB sends LinkedIn and Siteimprove events informing them that the user clicked for the page "small-business/bank/check-account-solutions."

94. As the next page loads, CNB sends events to Google, Siteimprove, and LinkedIn informing them that the user is now on a page titled "Business Checking Accounts | Camden National Bank" which offers "small-business/bank/check-account-solutions."

95. Once the user arrives on the business checking account application form, CNB sends events to LinkedIn, Siteimprove, and Google, reporting the user's navigation to "https://apply.camdennational.bank/sales."

96. CNB further reports more nuanced user details to Google, including when the user scrolls through the application form and that the user is applying for an account called Business Connect Checking.

97. Additionally, when the user proceeds through the application, CNB sends more events to Google reporting:

- when the user clicks on a text box to begin the application, with the event reporting that the user began the "form_start";
- that the user is beginning a "checkout" process for the "Business Connect Checking" account;
- that the user is on a page for "Business Info" when they proceeded to the portion of the application requesting the user's business details; and
- that the user is on the page for "Confirmation" when the user completed the form.

98. CNB also reports to Google the type of business for which the user is applying the business banking account.

25

99.     For example, if the user is applying for a business checking account for their single-member LLC, CNB reports to Google that the user's "organization_type: Single Member Llc."

**D.    CNB MAINTAINS AMBIGUOUS, DISINGENUOUS, AND DECEPTIVE PRIVACY POLICIES THAT FAIL TO SUFFICIENTLY DISCLOSE, NOTIFY, OR PROVIDE OPPORTUNITY TO OPT-OUT OF THE DISCLOSURE**

*i.     CNB's Privacy Representations*

100.    Customers never consented, agreed, authorized, or otherwise permitted Defendant to intercept its Personal and Financial Information or to use or disclose it for marketing and profit purposes. Customers were never provided with any written notice that Defendant disclosed its Personal and Financial Information to Third Parties (who then allowed fourth parties to use it for profit).

101.    Customers relied on Defendant to keep its Personal and Financial Information confidential and securely maintained and to use this information only for the purpose of providing legitimate financial services. Customers relied on Defendant to make only authorized disclosures of this information.

102.    Furthermore, Defendant actively misrepresented it would preserve the security and privacy of Customers' Personal and Financial Information.

103.    The contracts that CNB has with its Customers include CNB's "Online Services Privacy Policy," [52] its "Privacy Policies," [53] its "Terms of Use," [54] and its "Privacy Notice," [55] all of which it maintains on its Website (collectively, "Privacy Policies").

---

[52] *OS Privacy Policy* (Exhibit A).
[53] *See Privacy Policies* (Exhibit B).
[54] *Terms of Use*, https://www.camdennational.bank/terms-of-use (last visited Mar. 13, 2025) ("*Terms of Use*") (attached as Exhibit C).
[55]                              *Privacy                              Notice*, https://www.camdennational.bank/assets/files/Hnk7s8Mo/Camden%20National%20Bank%20Privacy%20Notice.pdf (last visited Mar. 13, 2025) ("*Privacy Notice*") (attached as Exhibit D).

104.    In its Online Services Privacy Policy,[56] CNB represents:

- Camden National Corporation and its affiliates ("Camden," "we," "us" or "our") respect your privacy and are committed to protecting it through our compliance with this Online Services Privacy Policy
- We strive to provide you with choices regarding the personal information you provide to us. This section describes mechanisms we provide for you to control certain uses and disclosures of your information.
- We have implemented measures intended to secure your personal information from accidental loss and from unauthorized access, use, alteration, and disclosure.

105.    In its Privacy Policies,[57] CNB tells its Customers:

- We understand how important it is to protect the privacy of those who visit this web site (the "Site") or who obtain products or services from us online through this Site.
- If you provide us with personally-identifiable information to request products and services through the Site, we may share the information that you provide to us with third parties in support of your request for these services. For example, if you provide us with information to enroll in our online banking product, we share that information with those service providers who are necessary to offer you that product. However we do not sell or otherwise make our online banking user list available to other third parties.
- We hold your online information to the same degree of confidentiality as other financial records.
- We keep completely confidential any information you may provide to us through the Site
- We restrict access to any personally-identifiable information that you may send to us through the Site to those employees who need to know that information to respond to provide you with the services that you requested or respond to your inquiry.

106.    In its Terms of Use,[58] CNB promises:

- The Bank is committed to protecting your personal and financial information.
- We maintain physical, electronic and procedural safeguards that comply with federal standards to guard your nonpublic, personal information.

107.    In its Privacy Notice, CNB tells its Customers that "[f]ederal law gives consumers the right to limit . . . sharing" and that "[w]e don't share" Customers' personal information "[f]or

---

[56] *See OS Privacy Policy* (Exhibit A)
[57] *See Privacy Policies* (Exhibit B).
[58] *See Terms of Use* (Exhibit C).

our affiliates' everyday business purposes"; "[f]or our affiliates to market to you" or "[f]or nonaffiliates to market to you.[59]

108.    Nowhere in any of CNB's Privacy Policies does CNB disclose its use of Customer Personal and Financial Information for Third Party and fourth party marketing.

109.    Customers reasonably understand that CNB will securely maintain the Personal and Financial Information it entrusted to it and protect that information from being shared or utilized by Third Parties (and fourth parties) that have nothing to do with CNB or its services. CNB's Privacy Policies only reinforced this reasonable understanding.

110.    CNB's failure to safeguard the privacy of Customers' Personal and Financial Information as agreed in its Privacy Policies is even more egregious here, as CNB also fails to provide Customers with sufficient opportunity to opt out of disclosure to affiliates or non-affiliates. CNB does not provide its Customers with **any** way to opt out of its disclosures.

111.    Even if a Customer were to try to call CNB, visit it in person, or request through some other means that CNB stop or otherwise limit the sharing of its Personal and Financial Information, the trackers are active on CNB's Website indiscriminately, regardless of what an individual Customer requests. When Customers visit CNB's Website, the Third Party trackers instantaneously send data from Customers that visit CNB's Website. Any opt-out request a Customer makes is thus entirely ineffective against Third Party trackers.

> ii.    *Third-Parties Further Share the Data and Information Collected from Trackers Installed on CNB's Website with Fourth Parties.*

112.    In addition to using the data for their own purposes, the third parties that obtain Customer data and information from trackers installed on CNB's website further profit from CNB's improper sharing practices by selling Customers' data to fourth parties.

---

[59] *See Privacy Notice* (Exhibit D).

113.    As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[60]

114.    Consequently, a fourth party that did not have a tracker directly installed on CNB's Website may obtain and use information collected via third-party trackers to provide direct advertisements to Customers on the fourth party's platform.

115.    One common recipient of Customers' collected data is Facebook.

116.    For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[61] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

117.    Facebook and Google both act as data brokers, meaning they collect data, compile it into datasets, and sell it to third parties.[62] Two other popular data brokers are Acxiom and Oracle

---

[60] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DOCONTROL (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

[61] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNEWS (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24. 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

[62] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24. 2025).

Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[63]

118.     Because of this, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a third-party (e.g., Facebook), which uses the information to advertise for various parties (like other financial institutions) on its own platform.[64] Alternatively, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (e.g., another financial institution), which uses the information to advertise for on other platforms (e.g., Facebook).[65] Or, one company's tracker (e.g., Google Analytics) may collect information, sell either the raw data or a compiled dataset to a third-party data broker (e.g., Acxiom or Oracle), which third party data broker sells the information to a fourth party (e.g., Facebook), which uses the information for still other parties' targeted advertising.[66] In any event, the basic idea and results are the same. Trackers like Facebook and Google Analytics track and disclose information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

---

[63] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

[64] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).

[65] *Id.*

[66] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.

119.    The information that data brokers like Acxiom and Oracle buy and compile from trackers (like Facebook's and Google's tackers) is inherently sensitive.

**E.    CNB VIOLATED THE GLBA, FTC STANDARDS, AND RELATED REGULATIONS**

120.    As a financial institution, CNB is subject to the GLBA. 15 U.S.C. § 6809(3)(A) (a "financial institution" is "any institution the business of which is engaging in financial activities...").

121.    Pursuant to the GLBA, "each financial institution has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

122.    The FTC has interpreted Section 5 of the FTC Act, 15 U.S.C. § 45, to include compliance with the GLBA Privacy Rule, 16 C.F.R. § 313.1 *et seq*. The FTC consistently enforces the GLBA Privacy Rule, as failure to comply with the GLBA Privacy Rule is an unfair act or practice prohibited by Section 5 of the FTC Act.[67]

123.    The GLBA Privacy Rule is a regulation that "governs the treatment of nonpublic personal information about consumers by the financial institutions." 16 C.F.R. § 313.1 *et seq*.

124.    Pursuant to the GLBA Privacy Rule, "[a] financial institution must provide a notice of its privacy policies and practices with respect to both affiliated and nonaffiliated third parties, and allow the consumer to opt out of the disclosure of the consumer's nonpublic personal information to a nonaffiliated third party if the disclosure is outside of the exceptions."[68] CNB consistently fails to do this.

---

[67] *See How to Comply with the Privacy Rule*, https://www.ftc.gov/business-guidance/resources/how-comply-privacy-consumer-financial-information-rule-gramm-leach-bliley-act (last visited Aug. 22, 2024) ("The FTC may bring enforcement actions for violations of the Privacy Rule.").
[68] *See* FTC, *Financial Privacy Rule*, https://www.ftc.gov/legal-library/browse/rules/financial-privacy-rule (last visited August 8, 2024).

125.    The GLBA Privacy Rule, defines sensitive information that should not be indiscriminately disclosed:

(n)    (1) Nonpublic personal information means:
           (i) Personally identifiable financial information; and
           (ii) Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.…
       (3) Examples of lists—
           (i) Nonpublic personal information includes any list of individuals' names and street addresses that is derived in whole or in part using personally identifiable financial information (that is not publicly available), such as account numbers.…

(o)    (1) Personally identifiable financial information means any information:
           (i) A consumer provides to you to obtain a financial product or service from you;
           (ii) About a consumer resulting from any transaction involving a financial product or service between you and a consumer; or
           (iii) You otherwise obtain about a consumer in connection with providing a financial product or service to that consumer.
       (2) Examples—
           (i) Information included. Personally identifiable financial information:
               (A) Information a consumer provides to you on an application to obtain a loan, credit card, or other financial product or service;
               (B) Account balance information, payment history, overdraft history, and credit or debit card purchase information;
               (C) The fact that an individual is or has been one of your customers or has obtained a financial product or service from you;
               (D) Any information about your consumer if it is disclosed in a manner that indicates that the individual is or has been your consumer;
               (E) Any information that a consumer provides to you or that you or your agent otherwise obtain in connection with collecting on, or servicing, a credit account;
               (F) Any information you collect through an Internet "cookie" (an information collecting device from a web server); and
               (G) Information from a consumer report.

16 C.F.R. § 313.3

126.    The information that CNB disclosed to Third Parties via trackers—including *e.g.*, information related to account applications, including the fact that a user was on a certain page, that users clicked certain buttons and what URLs or webpages they led to, their status as a customer, the type of bank account they are opening, and the Customer's business structure (information which CNB obtained from the Customer in connection with providing financial products and services)—is "nonpublic personal information" under the GLBA and related regulations. 16 C.F.R. § 313.3.

127.    CNB has utterly failed to meet its privacy obligations under the GLBA: it has explicitly disclosed Customers' nonpublic personal information and Personal and Financial Information to Third Parties for marketing and advertisement, including for Third Party and fourth party advertising use.

128.    CNB fails to meet its notice obligations under the GLBA. "[A] financial institution may not, directly or through any affiliate, disclose to a nonaffiliated third party any nonpublic personal information, unless such financial institution provides or has provided to the consumer a notice that complies with section 6803 of this title." 15 U.S.C.A. § 6802. As outlined at length above, CNB's Privacy Policies fail to put Customers on notice as required here and actually promise that Customers' Personal and Financial Information will not be shared with Third Parties (and fourth parties) for targeted advertising purposes.

129.    For example, by stating in its Privacy Policies that CNB maintains the confidentiality of Customers' Personal and Financial Information and **does not** inform Customers that it sells its Personal and Financial Information to Third Parties for its use in its own advertising and marketing, the Privacy Policies fail to properly disclose:

> (1) the policies and practices of the institution with respect to disclosing nonpublic personal information to nonaffiliated third parties . . . including []the categories

of persons to whom the information is or may be disclosed, other than the persons to whom the information may be provided [and] the policies and practices of the institution with respect to disclosing of nonpublic personal information of persons who have ceased to be customers of the financial institution . . .

(2) the categories of nonpublic personal information that are collected by the financial institution; [and]

(3) the policies that the institution maintains to protect the confidentiality and security of nonpublic personal information.

15. U.S.C.A. § 6803.

130.    As detailed above, CNB also fails to meet its opt out obligations under the GLBA. The GLBA Privacy Rule requires financial institutions to, for example, "provide an opt out notice" to Customers, which notice "must state…[t]hat the consumer has the right to opt out of that disclosure [and] [a] reasonable means by which the consumer may exercise the opt out right." 16 C.F.R. § 313.7. Under the GLBA, CNB

may not disclose nonpublic personal information to a nonaffiliated third party unless—

(A) [it] clearly and conspicuously discloses to the consumer. . . that such information may be disclosed to such third party;

(B) *the consumer is given the opportunity*, before the time that such information is initially disclosed, *to direct that such information not be disclosed to such third party*; and

(C) the consumer is given an explanation of how the consumer can exercise that nondisclosure option.

15 U.S.C.A. § 6802 (emphasis added).

131.    CNB fails to meet its opt out obligations because, as outlined above, CNB does not clearly and conspicuously disclose to Customers its Disclosure of their Personal and Financial Information to Third Parties.

132.    CNB further fails to meet its opt out obligations because Customers are not provided an opportunity before disclosure to direct the nondisclosure of its information—as described above, CNB instantaneously discloses information when Customers visit its Website.

133.    By perpetually disclosing its customers' Personal and Financial Information to third parties without consent, CNB failed and continues to fail to meet its obligations under the GLBA, FTC standards, and related regulations, to establish appropriate standards and safeguards relative to Customers' Personal and Financial Information.

F.    PLAINTIFFS' EXPERIENCES

134.    Plaintiff Michael Lessner is CNB's Customer.

135.    Plaintiff Lessner visited CNB's Website and applied for Defendant's services sometime in or around 2019 or 2020, when he applied for and received a credit card.

136.    Plaintiff Lessner has used Defendant's Website to facilitate its financial services with Defendant and inputted Personal and Financial Information into Defendant's Website at Defendant's direction and encouragement.

137.    Plaintiff Lessner is a Facebook user.

138.    Plaintiff Moore has a CNB personal checking account and is CNB's Customer.

139.    Plaintiff Moore opened a personal checking account online with CNB in October 2024.

140.    Plaintiff Moore has used Defendant's Website to facilitate its financial services with Defendant and inputted Personal and Financial Information into Defendant's Website at Defendant's direction and encouragement.

141.    Plaintiff Moore is a Facebook user.

142.    Shortly after Plaintiffs used Defendant's Website, they received advertising on social media for different banks and applying for cards.

143.    Plaintiffs relied on Defendant's Website to communicate Personal and Financial Information and did so with the understanding that CNB would not share their Personal and Financial Information except as agreed in the Privacy Policies.

144.    At no point did Customers like Plaintiffs sign any written authorization permitting Defendant to send its Personal and Financial Information to Third Parties (or fourth parties) uninvolved in providing it with Defendant's financial services.

145.    Plaintiffs reasonably expected that their communications with CNB were confidential, solely between it and CNB, and that, as such, those communications and any Personal and Financial Information submitted would not be transmitted to or intercepted by a third party (or used by a fourth party).

146.    Plaintiffs provided their Personal and Financial Information to Defendant and trusted that the information would be safeguarded according to CNB's promises and the law.

147.    Had they been aware of CNB's sharing practices, Plaintiffs would not have authorized CNB to make their Personal and Financial Information available for sale on the resale market.

148.    Plaintiffs never intended to let CNB benefit from their Personal and Financial Information.

149.    Through the systematic data sharing process described in this complaint, Plaintiffs' interactions with CNB's Website were disclosed to Third Parties, including Facebook and Google. Plaintiffs did not consent to those disclosures.

150.    On information and belief, through its use of Third Party trackers on its Website, Defendant disclosed to Third Parties information Plaintiffs provided to CNB as a financial institution and resulting from activities performed on Defendant's Website.

151.    On information and belief, through its use of Third Party trackers on its Website, Defendant disclosed, at a minimum, to Third Parties information Plaintiffs provided to CNB as a financial institution and resulting from a transaction for Plaintiffs to obtain or access Defendant's financial services, including each Plaintiff's:

      a.  Existing user or Customer status;

      b.  Browsing activities, including the pages and content Plaintiffs viewed;

      c.  The type of bank account opened;

      d.  c_user cookie to identify a logged-in Facebook account; and

      e.  Information collected through an Internet "cookie" (or information collecting device from a web server).

152.    By failing to receive the requisite consent, CNB breached confidentiality and unlawfully disclosed Plaintiffs' Personal and Financial Information.

153.    Plaintiffs would not have submitted their information to CNB if they had known it would be shared with Third Parties and further sold to fourth parties for purposes of marketing Third and fourth party products.

154.    As a result of CNB's Disclosure of Plaintiffs' Personal and Financial Information via the trackers like Facebook, Google, and other tracking technologies to Third Parties (and fourth parties) without authorization, Plaintiffs were harmed in the following ways:

      a.  Loss of privacy;

      b.  Unauthorized disclosure of their Personal and Financial Information;

      c.  Unauthorized access to their Personal and Financial Information by Third Parties;

      d.  CNB benefited from the use of Plaintiffs' Personal and Financial Information without sharing that benefit with Plaintiffs;

e.  Repeated targeted advertisements from Third and fourth parties on social media and other third-party websites, reflecting Plaintiffs' Personal and Financial Information that was improperly disclosed and used;

f.  Lost benefit of their bargain with CNB, as Plaintiffs did not receive the reasonable privacy and data security protections for which they paid;

g.  CNB enriched itself at Plaintiffs' expense without sharing the revenue and profit attributable to collecting Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties);

h.  CNB profited off of disclosing Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties) through savings in marketing costs;

i.  CNB profited as a result of collecting Plaintiffs' Personal and Financial Information without authorization and sharing it with Third Parties (and fourth parties) through its revenues and profits attributable to serving and monetizing advertisements directed to Plaintiffs;

j.  Plaintiffs lost their ability to keep their Personal and Financial Information private or allow CNB to track their data;

k.  Embarrassment, humiliation, frustration, and emotional distress;

l.  Decreased value of Plaintiffs' Personal and Financial Information;

m.  Increased risk of future harm resulting from future use and disclosure of their Personal and Financial Information; and

n.  Statutory damages.

## **TOLLING, CONCEALMENT, AND ESTOPPEL**

155.    The applicable statutes of limitation have been tolled as a result of CNB's knowing and active concealment and denial of the facts alleged herein.

156.    CNB seamlessly incorporated trackers into its Website while providing Customers using those platforms with no indication that its Website usage was being tracked and transmitted to Third Parties. CNB knew that its Website incorporated trackers, yet it failed to disclose to Plaintiffs and Class Members that its sensitive Personal and Financial Information would be intercepted, collected, used by, and disclosed to Third Parties.

157.    Plaintiffs and Class Members could not with due diligence have discovered the full scope of CNB's conduct, because there were no disclosures or other indication that it were interacting with websites employing tracking technology to unauthorizedly disclose its Personal and Financial Information to unaffiliated Third Parties or that their information would subsequently be sold to fourth parties for the purpose of marketing third and fourth party products.

158.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. CNB's illegal interception and disclosure of Plaintiffs' and the Class's Personal and Financial Information has continued unabated. What is more, CNB was under a duty to disclose the nature and significance of its data collection practices but did not do so. CNB is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

159.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all other similarly situated persons pursuant to Fed. R. Civ. P. 23.

160.    Plaintiffs seek to represent the following classes:

**Nationwide Class**: All individuals in the United States who have had or applied for financial services with CNB within the applicable statute of limitations and whose Personal and Financial Information was disclosed by Defendant to Third Parties through Defendant's Website's tracking technology without authorization.

**Maine Subclass**: All individuals in Maine who have had or applied for financial services with CNB within the applicable statute of limitations and whose Personal and Financial Information was disclosed by Defendant to Third Parties through Defendant's Website's tracking technology without authorization.

161.    Excluded from the Classes are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as its immediate family members.

162.    Plaintiffs reserve the right to modify or amend the definition of the proposed classes before the Court determines whether certification is appropriate.

163.    This action satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23(a)(1)-(4).

164.    <u>Numerosity</u>: Class Members are so numerous and geographically dispersed that joinder of all members is impracticable. Upon information and belief, there likely millions of individuals throughout the United States whose Personal and Financial Information has been improperly used or disclosed by Defendant, and the Classes are identifiable within Defendant's records.

165.    <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

166.    <u>Commonality and Predominance</u>: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

      a.    Whether Defendant disclosed Class Members' Personal and Financial Information to Third Parties;

b.  Whether Class Members consented to Defendant's disclosure of its Personal and Financial Information;

c.  Whether Defendant owed duties to Plaintiffs and Class Members to protect its Personal and Financial Information;

d.  Whether Defendant breached its duty to protect Plaintiffs' and Class Members' Personal and Financial Information;

e.  Whether Defendant's disclosure of Plaintiffs' and Class Members' Personal and Financial Information to Third Parties violated federal, state and local laws, or industry standards;

f.  Whether Defendant's failure to allow Customers a meaningful opportunity to opt out of sharing with Third Parties violated federal, state and local laws, or industry standards;

g.  Whether Defendant's conduct resulted in or was the actual cause of the disclosure of Plaintiffs' and Class Members' and Personal and Financial Information;

h.  Whether Defendant's conduct resulted in or was the proximate cause of the disclosure of Plaintiffs' and Class Members' Personal and Financial Information;

i.  Whether Defendant has a contractual obligation to protect Plaintiffs' and Class Members' Personal and Financial Information and whether it complied with such contractual obligation;

j.  Whether Defendant has a duty sounding in bailment to protect Plaintiffs' and Class Members' Personal and Financial Information and whether it complied with such obligation;

k.  Whether Defendant has a duty of confidence and whether it complied with such obligation;

l.  Whether Defendant's conduct amounted to violations of state consumer protection statutes;

m.  Whether Defendant's conduct amounted to violations of state and federal wiretap statutes;

n.  Whether Defendant's conduct amounted to violations of other Maine state laws;

o.  Whether Defendant should retain Plaintiffs' and Class Members' valuable Personal and Financial Information;

p.  Whether, as a result of Defendant's conduct, Plaintiffs and Class Members are entitled to injunctive, equitable, declaratory and/or other relief, and, if so, the nature of such relief.

167.    Defendant has engaged in a common course of conduct toward Plaintiffs and the Class Members, in that the Plaintiffs' and Class Members' data was stored on the same computer system and unlawfully disclosed and accessed in the same way. As set forth above, the common issues arising from Defendant's conduct affecting Class Members predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

168.    <u>Typicality</u>: Plaintiffs' claims are typical of those of other Class Members because all had its Personal and Financial Information compromised as a result of Defendant's use and incorporation of Facebook trackers, Google trackers, and other tracking technology.

169.    <u>Policies Generally Applicable to the Classes</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to

the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

170.    <u>Adequacy</u>: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

171.    <u>Superiority and Manageability</u>: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute its common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

172.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure

to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because it would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Classes and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

173.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

174.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

175.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure and failure to properly secure the Personal and Financial Information of Plaintiffs and the Class Members, Defendant may continue to refuse to provide proper notification to and obtain proper consent from Class Members, and Defendant may continue to act unlawfully as set forth in this Complaint.

176.    Moreover, Defendant has acted or refused to act on grounds generally applicable to the Classes, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Classes is appropriate.

44

177.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a.    Whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding its Personal and Financial Information;

b.    Whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding its Personal and Financial Information;

c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of customer information;

d.    Whether Defendant was negligent;

e.    Whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that contract;

f.    Whether Defendant breached the contract;

g.    In the alternate, whether Defendant was unjustly enriched;

h.    Whether a bailment existed between Defendant on the one hand, and Plaintiffs and Class Members on the other;

i.    Whether Defendant breached its bailment duty;

j.    Whether Defendant adequately and accurately informed Plaintiffs and Class Members that its Personal and Financial Information had been used and disclosed to Third Parties and used for Third Party and fourth party benefit;

k.    Whether Defendant failed to implement and maintain reasonable security procedures and practices;

l.    Whether Defendant invaded Plaintiffs and the Class Members' privacy;

m.    Whether Defendant breached its implied duty of confidentiality; and,

n.    Whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiffs and the Classes)

178.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

179.    Plaintiffs and Class Members submitted sensitive nonpublic personal information, including Personal and Financial Information, when accessing CNB's Website.

180.    Defendant owed Defendant owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' Personal and Financial Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from disclosure and unauthorized transmittal and use of Personal and Financial Information that occurred.

181.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' Personal and Financial Information.

182.    Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of its Personal and Financial Information being improperly disclosed to unauthorized Third Parties.

183.    Defendant's duties to keep the nonpublic personal information, including Personal and Financial Information, confidential also arose under the GLBA, which imposes "an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. § 6801(a).

184.    Defendant's duties to keep the nonpublic personal information, including Personal and Financial Information, confidential also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including the unfair practice of failing to keep the nonpublic personal information confidential. Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

185.    Pursuant to the laws set forth herein, including the FTC Act, the GLBA, and state law, Defendant was required by law and industry standards to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Personal and Financial Information.

186.    Defendant violated its duty under Section 5 of the FTC Act, the GLBA, and/or state law by failing to use reasonable measures to protect Plaintiffs' and Class Members' Personal and Financial Information and not complying with applicable industry standards as described in detail herein.

187.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' Personal and Financial Information by disclosing

and providing access to this information to Third Parties for the financial benefit of the Third Parties (and fourth parties) and Defendant.

188.    Defendant owed these duties to Plaintiffs and Class Members because it are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of its Personal and Financial Information to benefit Third Parties (and fourth parties) and Defendant. Defendant actively sought and obtained Plaintiffs' and Class Members' Personal and Financial Information. And Defendant knew or should have known that by integrating tracking technology on its Website that Plaintiffs' and Class Members' nonpublic personal information, including Personal and Financial Information, would be disclosed to the Third Parties (and used by the fourth parties).

189.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' Personal and Financial Information in compliance with applicable laws would result in unauthorized Third Parties and fourth parties gaining access to Plaintiffs' and Class Members' Personal and Financial Information, and resulting in Defendant's liability under principles of negligence *per se*.

190.    Personal and Financial Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing its Personal and Financial Information to Third Parties. This disclosure was of benefit to the Third Parties (and fourth parties) and Defendant by way of data harvesting, advertising, and increased sales.

191.    Plaintiffs' and Class Member's Personal and Financial Information constitutes personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiffs and Class Members.

192.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Personal and Financial Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class Members' injuries.

193.    As a direct, proximate, and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or imminently will suffer injury and damages, including monetary damages, inappropriate advertisements and use of its Personal and Financial Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

194.    Defendant's negligence and breach of its common-law duties to exercise reasonable care, directly and proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation: the unauthorized access of its Personal and Financial Information by Third Parties (and fourth parties); improper disclosure of its Personal and Financial Information; receipt of targeted advertisements reflecting private financial information; lost benefit of its bargain; lost value of its Personal and Financial Information and diminution in value; embarrassment, humiliation, frustration, and emotional distress; lost time and money incurred to mitigate and remediate the effects of use of its information, as to targeted advertisements that resulted from and were caused by Defendant's negligence; value to Plaintiffs and the Class Members of surrendering its choices to keep its Personal and Financial Information private and allowing Defendant to track its data; increased risk of future harm resulting from future use and disclosure of Plaintiffs' and the Class Members' Personal and Financial Information; and other injuries and damages as set forth herein. These injuries are ongoing, imminent, immediate, and continuing.

49

195.    Defendant's negligence directly and proximately caused the unauthorized access and Disclosure of Plaintiffs' and Class Members' Personal and Financial Information, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual and compensatory damages, and all other relief it may be entitled to as a proximate result of Defendant's negligence.

196.    Plaintiffs and Class Members seek to recover the value of the unauthorized access to its Personal and Financial Information resulting from Defendant's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's personal information is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiffs may generally recover the reasonable use value of the intellectual property—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such intellectual property to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiffs and Class Members have a protectible property interest in its Personal and Financial Information; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions

197.    Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiffs

and Class Members in conscious disregard of its rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

## COUNT II
## INVASION OF PRIVACY
### (On Behalf of Plaintiffs and the Classes)

198.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

199.    Plaintiffs and Class Members submitted sensitive nonpublic personal information, including Personal and Financial Information, when accessing CNB's Website that it intended for only Defendant to receive and that it understood Defendant would keep private.

200.    Plaintiffs and Class Members had a reasonable expectation of privacy in its communications with Defendant via its Website and the communications platforms and services therein.

201.    Plaintiffs and Class Members had a reasonable expectation of privacy given Defendant's representations and Privacy Policies, as well as state and federal law. Moreover, Plaintiffs and Class Members have a general expectation that its communications regarding its finances with its financial providers will be kept confidential. Defendant's disclosure of Personal and Financial Information is highly offensive to the reasonable person.

202.    In its Disclosure, Defendant publicized private details and facts not generally known to the public, not publicly available, and not of legitimate public concern about Plaintiffs and the Class by disclosing and exposing Plaintiffs' and the Class's Personal and Financial Information, including sensitive financial information, to enough people that it is reasonably likely those facts will become known to the public at large.

203.    The disclosure of Customers' Personal and Financial Information is particularly harmful and would be offensive to a reasonable person of ordinary sensibilities.

51

204.    Defendant has a special relationship with Plaintiffs and Class Members and Defendant's disclosure of Personal and Financial Information as described herein is certain to offend its dignity. As it installed the Third Party Trackers, Defendant should appreciate that the Disclosure would result in dissemination of Personal and Financial Information to unauthorized parties.

205.    The tort of public disclosure of private facts is recognized in Maine. *See Berthiaume's Estate v. Pratt,* 365 A.2d 792, 795 (Me. 1976). Plaintiffs' and the Class's Personal and Financial Information was publicly disclosed by Defendant in the Disclosure intentionally and/or with reckless disregard for the reasonable offensiveness of the disclosure.

206.    Such Disclosure is highly offensive and would be to any person of ordinary sensibilities. Defendant knew or should have known that Plaintiffs' and the members of the Class's Personal and Financial Information is not a matter of legitimate public concern.

207.    As a direct and proximate result of Defendant's invasion of privacy and public disclosure of private facts, Plaintiffs and members of the Class have suffered injury-in-fact and damages, including, without limitation, the unauthorized access of its Personal and Financial Information by third parties, improper disclosure of its Personal and Financial Information, lost benefit of its bargain, lost value of its Personal and Financial Information, and lost time and money incurred to mitigate and remediate the effects of use of its information that resulted from and were caused by Defendant's conduct. These injuries are ongoing, imminent, immediate, and continuing.

208.    As a direct and proximate result of Defendant's invasion of privacy—public disclosure of privacy facts, Plaintiffs and the Class are entitled to recover damages including actual and compensatory damages, and punitive damages, as permitted by law.

## COUNT III
## BREACH OF EXPRESS AND IMPLIED CONTRACT

**(On Behalf of Plaintiffs and the Classes)**

209.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

210.    Plaintiffs and Class Members also entered into an express and implied contract with CNB when it obtained financial services from CNB, or otherwise provided nonpublic personal information, including Personal and Financial Information, to CNB.

211.    As part of these transactions, CNB explicitly and implicitly agreed to safeguard and protect Plaintiffs' and Class Members' Personal and Financial Information.

212.    Plaintiffs and Class Members entered into express and implied contracts with the reasonable expectation (based on CNB's own express and implied promises) that CNB would keep its nonpublic personal information, including Personal and Financial Information, confidential. Plaintiffs and Class Members believed that CNB would use part of the monies paid to CNB under the express and implied contracts to keep its nonpublic personal information, including Personal and Financial Information, confidential.

213.    Plaintiffs and Class Members would not have provided and entrusted its nonpublic personal information, including Personal and Financial Information, or would have paid less for CNB's services in the absence of the express and implied contract or implied terms between it and CNB. The safeguarding of the nonpublic personal information, including Personal and Financial Information, of Plaintiffs and class members was critical to realize the intent of the parties.

214.    As extensively detailed above, CNB breached its express and implied contracts with Plaintiffs and class members to protect its nonpublic personal information, including Personal and Financial Information, when it disclosed that information to Third Parties.

215.    As a direct and proximate result of CNB's breach of express and implied contract, Plaintiffs and Class Members sustained actual losses and damages as described in detail above.

## COUNT IV
## UNJUST ENRICHMENT (IN THE ALTERNATIVE TO CONTRACT CLAIMS)
### (On Behalf of Plaintiffs and the Classes)

216.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

217.    Plaintiffs and Class Members have an interest, equitable, legal, and financial, in their Personal and Financial Information that was conferred upon, collected by, and maintained by Defendant and that was ultimately disclosed without its consent.

218.    Plaintiffs and Class Members conferred a monetary benefit upon Defendant in the form of valuable, sensitive, personal, and financial information—Personal and Financial Information—that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, for marketing purposes, and for sale or trade with Third Parties. Defendant did not share this benefit with Plaintiffs and Class Members.

219.    Plaintiffs and Class Members would not have used Defendant's services, or would have paid less for those services, if it had known that Defendant would collect, use, and disclose its Personal and Financial Information to Third Parties or allow Third Parties (and fourth parties) to use its Personal and Financial Information.

220.    Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

221.    The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members itself. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

222.    Defendant continues to benefit and profit from its retention and use of Plaintiffs' and Class Members' Personal and Financial Information, while its value to Plaintiffs and Class Members has been diminished.

223.    Plaintiffs plead this claim separately as well as in the alternative to claims for damages under Fed. R. Civ. P. 8(a)(3), because if the Court dismisses Plaintiffs' claims for damages or enters judgment on it in favor of the Defendant, Plaintiffs' will have no adequate legal remedy. Plaintiffs make the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in it other causes of action, in the event that such causes of action do not succeed. Plaintiffs and the Class Members may be unable to obtain monetary, declaratory and/or injunctive relief directly under other causes of action, and, if so, will lack an adequate remedy at law.

224.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of the conduct and the unauthorized Disclosure alleged herein.

## COUNT V
## BAILMENT
### (On Behalf of Plaintiffs and the Classes)

225.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

226.    Plaintiffs, Class Members, and Defendant contemplated a mutual benefit bailment when Plaintiffs and Class Members transmitted its Personal and Financial Information to Defendant solely for financial services and the payment thereof.

227.    Plaintiffs' and Class Members' Personal and Financial Information was transmitted to Defendant in trust for a specific and sole purpose of receiving CNB's financial services, with an

implied contract that the trust was to be faithfully executed, and the Personal and Financial Information was to be accounted for when the special purpose was accomplished.

228.    Defendant was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiffs' and Class Members' Personal and Financial Information.

229.    Plaintiffs' and Class Members' Personal and Financial Information was used for a different purpose than Plaintiffs and Class Members intended, for a longer time period and/or in a different manner or place than the parties intended.

230.    Defendant's breach of the bailment was a legal cause of injury-in-fact and damage to Plaintiffs and Class Members, including but not limited to, the unauthorized access of its Personal and Financial Information by Third Parties, improper use of its Personal and Financial Information by Third Parties and fourth parties, improper disclosure of its Personal and Financial Information, lost benefit of its bargain, lost value of its Personal and Financial Information, and lost time and money incurred to mitigate and remediate the effects of use of its information that resulted from and were caused by Defendant's tortious conduct. These injuries are ongoing, imminent, immediate, and continuing.

231.    As a direct and proximate result of Defendant's breach of the bailment, Plaintiffs and Class Members are entitled to and do demand actual, compensatory, and punitive damages, as well as injunctive relief, and all other relief allowed by law.

## COUNT VI
## DECLARATORY JUDGMENT
### (On Behalf of Plaintiffs and the Classes)

232.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

233.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant

further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this complaint.

234.    An actual controversy has arisen regarding CNB's present and prospective common law and other duties to keep its Customers' Personal and Financial Information confidential and whether Defendant is currently keeping that information confidential. Plaintiffs remain CNB Customers who need to use the CNB's Website to manage their accounts and the financial services provided by CNB. Plaintiffs and similar Class Members thus remain at imminent risk that additional disclosure of its Personal and Financial Information will occur in the future.

235.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.   Defendant continues to owe a legal duty to secure Customers' Personal and Financial Information, under the common law, Section 5 of the FTC Act, the GLBA, and various state statutes;

      b.   Defendant continues to breach this legal duty by disclosing its Customers' Personal and Financial Information, to unaffiliated Third Parties.

236.    The Court also should issue corresponding prospective injunctive relief requiring Defendant to keep its nonpublic personal information, including Personal and Financial Information, confidential consistent with law and industry standards.

237.    If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury, and lack an adequate legal remedy. The risk of additional disclosure is real, immediate, and substantial, as trackers remain operative on Defendant's website to this day. If additional disclosure occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of

the resulting injuries are not readily quantified and it will be forced to bring multiple lawsuits to rectify the same conduct.

238.   The hardship to Plaintiffs and Class Members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if CNB continues to disclose its Customers' Personal and Financial Information, Plaintiffs and Class Members will likely be subjected to the harms described herein. On the other hand, the cost to Defendant of complying with an injunction by keeping its Customers' Personal and Financial Information, confidential is relatively minimal (for example, removing trackers from its website), and Defendant has a pre-existing legal obligation to do so.

239.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing CNB's additional unlawful disclosures of Customers' Personal and Financial Information, thus eliminating the additional injuries that would result to Plaintiffs and the hundreds of thousands of Customers whose information has been and will continue to be disclosed.

## COUNT VII
## VIOLATION OF MAINE'S CONFIDENTIAL FINANCIAL RECORDS ACT, 9-B M.R.S. § 161, *ET SEQ.*
### (On Behalf of Plaintiffs and the Maine Subclass)

240.   Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

241.   9-B M.R.S. § 466 provides that: "Any information derived from financial institution records or sources . . . may not be disclosed except in the regular course of business."

242.   Plaintiffs and Class Members are "customers" as defined under 9-B M.R.S. § 161, as they utilized or attempted to utilize a service of a financial institution authorized to do business in Maine.

243.    CNB, through the trackers it installed on its website, copied Plaintiffs' and Class Members' financial records in CNB's custody, in violation of 9-B M.R.S. § 466. "[V]iolation of this section is a strict liability crime." *Id.*

244.    CNB further violated 9-B M.R.S. § 466 by concealing its actions. CNB concealed its actions when it seamlessly incorporated trackers into its Website while providing Customers using those platforms with no indication that its Website usage was being tracked and transmitted to Third Parties. CNB knew that its Website incorporated trackers, yet it failed to disclose to Plaintiffs and Class Members that its sensitive Personal and Financial Information would be intercepted, collected, used by, and disclosed to Third Parties

245.    Plaintiffs have been injured as a direct and proximate result of CNB's violations of 9-B M.R.S. § 161.

246.    Under 9-B M.R.S. § 164, Plaintiffs are entitled to statutory damages of $10,000 per violation of this statue.

247.    In addition to statutory damages, Defendant's violation of 9-B M.R.S. § 466caused Plaintiffs and Class Members the following damages.

    a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private.

    b.    Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

    c.    Plaintiffs and Class Members did not get the full value of the financial services for which it paid, which included Defendant's duty to maintain confidentiality; and

d.  Defendant's actions diminished the value of Plaintiffs' and Class Members' personal information.

248.  Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT VIII
## VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT
### 18 U.S.C. §§ 2511(1), ET SEQ.
### (On Behalf of Plaintiffs and the Classes)

249.  Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

250.  The ECPA protects both sending and receipt of communications. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

251.  The transmissions of Plaintiffs' and Class Members' Personal and Financial Information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

252.  **Electronic Communications**. The transmission of Personal and Financial Information between Plaintiffs and Class Members and Defendant's Website with which it chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

253.  **Content**. The ECPA defines content, when used with respect to electronic communications, to "include [] any information concerning the substance, purport, or meaning of that communication." *See* 18 U.S.C. § 2510(8).

60

254.    **Interception**. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents…include any information concerning the substance, purport, or meaning of that communication." See 18 U.S.C. § 2510(4), (8).

255.    **Electronic, Mechanical or Other Device**. The ECPA defines "electronic, mechanical, or other device" as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

    a.    Plaintiffs' and Class Members' browsers;

    b.    Plaintiffs' and Class Members' computing devices;

    c.    Defendant's web-servers;

    d.    Defendant's Website; and

    e.    The tracking technology deployed by Defendant effectuated the sending and acquisition of customer communications.

256.    By utilizing and embedding the tracking technology on its Website, Defendant intentionally intercepted, endeavored to intercept and procured another person to intercept the electronic communications of Plaintiffs and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

257.    Specifically, Defendant intercepted Plaintiffs' and Class Members' electronic communications via the tracking technology which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Personal and Financial Information to Third Parties.

258.    Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiffs and Class Members regarding Personal and Financial Information.

259.   By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs and Class Members to Third Parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

260.   By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

261.   **Unauthorized Purpose.** Defendant intentionally intercepted the contents of Plaintiffs' and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

262.   Defendant intentionally used the wire or electronic communications to increase its profit margins and save on marketing costs.

263.   Defendant specifically used tracking technology to track and to utilize Plaintiffs' and Class Members' Personal and Financial Information for financial gain.

264.   Defendant was not acting under color of law to intercept Plaintiffs' and Class Members' wire or electronic communication.

265.   Plaintiffs and Class Members did not authorize Defendant to acquire the content of its communications for purposes of invading Plaintiffs' and Class Members' privacy via the tracking technology.

266.   In sending and in acquiring the content of Plaintiffs' and Class Members' communications relating to the browsing of its Website, Defendant's purpose was tortious,

criminal and designed to violate federal and state legal provisions, including as described above the following: (i) a knowing intrusion into a private, place, conversation or matter that would be highly offensive to a reasonable person; and (ii) violation of GLBA, the FTC Act, invading Plaintiffs' and Class Members' privacy, and in breach of its fiduciary duty of confidentiality.

### COUNT IX
### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT 18 U.S.C. § 2511(3)(A) UNAUTHORIZED DIVULGENCE BY ELECTRONIC COMMUNICATIONS SERVICE
### (On Behalf of Plaintiffs and the Classes)

267.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

268.    The ECPA provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

269.    **Electronic Communication Service**. An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant's Website is an electronic communication service which provides to users thereof, customers of Defendant, the ability to send or receive electronic communications; in the absence of Defendant's Website, internet users could not send or receive communications regarding Plaintiffs' and Class Members' Personal and Financial Information.

270.    **Intentional Divulgence**. Defendant intentionally designed the tracking technology and was or should have been aware that, if so configured, it could divulge Plaintiffs' and Class Members' Personal and Financial Information. Upon information and belief, Defendant's

divulgence of the contents of Plaintiffs' and Class Members' communications was contemporaneous with its exchange with Defendant's Website, to which it directed its communications.

271.    Defendant divulged the contents of Plaintiffs' and Class Members' electronic communications without authorization and/or consent.

272.    **Exceptions do not apply**. In addition to the exception for communications directly to an electronic communications service ("ECS")[69] or an agent of an ECS, the ECPA states that

> A person or entity providing electronic communication service to the public may divulge the contents of any such communication—
>
> (i)    as otherwise authorized in section 2511(2)(a) or 2517 of this title;
> (ii)   with the lawful consent of the originator or any addressee or intended recipient of such communication;
> (iii)  to a person employed or authorized, or whose facilities are used, to forward such communication to its destination; or
> (iv)   which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency.

U.S.C. § 2511(3)(b).

273.    Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

274.    Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications to Third Parties was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was

---

[69] An ECS is "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

neither: (i) a necessary incident to the rendition of Defendant's service nor (ii) necessary to the protection of the rights or property of Defendant.

275.    Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

276.    Defendant's divulgence of the contents of Plaintiffs' and the Class Members' communications on its Website through the tracking technology was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." 18 U.S.C.A. § 2511(3)(b)(ii). As alleged above: (i) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of its communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Class Members were exchanging information.

277.    Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

278.    The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of its communications to a law enforcement agency.

279.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

## COUNT X
## VIOLATION OF TITLE II OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("STORED COMMUNICATIONS ACT") 18 U.S.C. § 2702, ET SEQ.

65

**(On Behalf of Plaintiffs and the Classes)**

280.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

281.    The ECPA further provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

282.    **Electronic Communication Service**. ECPA defines "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). Defendant intentionally procures and embeds various Plaintiffs' and Class Members' Personal and Financial Information through the tracking technology used on Defendant's Website, which qualifies as an Electronic Communication Service.

283.    **Electronic Storage**. ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of such communication." 18 U.S.C. § 2510(17).

284.    Defendant stores the content of Plaintiffs' and Class Members' communications on Defendant's Website and files associated with it.

285.    When Plaintiffs or Class Members make a Website communication, the content of that communication is immediately placed into storage.

286.    Defendant knowingly divulges the contents of Plaintiffs' and Class Members' communications through the tracking technology.

287.    **Exceptions Do Not Apply**. Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider

may divulge the contents of a communication—

(1) to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient;

(2) as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this title;

(3) with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service;

(4) to a person employed or authorized or whose facilities are used to forward such communication to its destination;

(5) as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service;

(6) to the National Center for Missing and Exploited Children, in connection with a report submitted thereto under section 2258A;

(7) to a law enforcement agency—

(A) if the contents—

(i) were inadvertently obtained by the service provider; and

(ii) appear to pertain to the commission of a crime; . . .

(8) to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency; or

(9) to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies Section 2523.

288.    Defendant did not divulge the contents of Plaintiffs' and Class Members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiffs and Class Members.

289.    Sections 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

290.    Section 2511(2)(a)(i) provides:

It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

291.    Defendant's divulgence of the contents of Plaintiffs' and Class Members' communications on its Website to Third Parties was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither: (i) a necessary incident to the rendition of the Defendant's services nor (ii) necessary to the protection of the rights or property of Defendant.

292.    Defendant's divulgence of the contents of Plaintiffs' and Class Members' customer user communications on its Website was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." 18 U.S.C.A. § 2511(3)(b)(ii). As alleged above: (i) Plaintiffs and Class Members did not authorize Defendant to divulge the contents of its communications and (ii) Defendant did not procure the "lawful consent" from the websites or apps with which Plaintiffs and Class Members were exchanging information.

293.    Moreover, Defendant divulged the contents of Plaintiffs' and Class Members' communications through the tracking technology to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

294.    The contents of Plaintiffs' and Class Members' communications did not appear to pertain to the commission of a crime and Defendant did not divulge the contents of its communications to a law enforcement agency.

295.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages, preliminary and other equitable or declaratory relief as may be appropriate, punitive damages in an amount to be determined by a jury and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT XI**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA")**
**18 U.S.C. § 1030, ET SEQ.**
**(On Behalf of Plaintiffs and the Classes)**

296.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

68

297.    Plaintiffs' and the Class Members' computers and mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

298.    Defendant exceeded, and continues to exceed, authorized access to Plaintiffs' and the Class Members' protected computers and obtained information thereby, in violation of 18 U.S.C. § 1030(a)(2), (a)(2)(C).

299.    Defendant's conduct caused "loss to 1 or more persons during any 1-year period… aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, because of the secret transmission of Plaintiffs' and the Class Members' Personal and Financial Information as set forth in detail herein, which were never intended for public consumption.

300.    Defendant's conduct also constitutes "a threat to public health or safety" under 18 U.S.C. § 1030(c)(4)(A)(i)(IV), due to the private and personally identifiable data and content of Plaintiffs and the Class Members' Personal and Financial Information and communication being made available to Defendant and Third Parties without adequate legal privacy protections.

301.    Accordingly, Plaintiffs and the Class Members are entitled to "maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually, on behalf of themselves and all others similarly situated, prays for judgment as follows:

A.    For an Order certifying this action as a Class action and appointing Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

B.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

C.   For an award of punitive damages, as allowable by law;

D.   For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Personal and Financial Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

E.   For an Order declaring the rights and obligations of the parties, including, without limitation, that Defendant owes a legal duty to its Customers to secure their Personal and Financial Information and that Defendant violates this legal duty by disclosing its Customers' Personal and Financial Information to unaffiliated Third Parties;

F.   For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Personal and Financial Information compromised and unlawfully disclosed to Third Parties;

G.   For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

H.   For an Order compelling Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Classes;

I.   For an award of reasonable attorneys' fees and costs under the laws outlined above, the common fund doctrine, and any other applicable law;

J.   Costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

K.   Pre- and post-judgment interest on any amounts awarded; and

L.  Such other and further relief as this court may deem just and proper.

## JURY DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby demand a trial by jury on all issues so triable.

Dated: June 5, 2025                                Respectfully submitted,

                                                   */s/Dov Sacks*
                                                   Dov Sacks
                                                   Maine Bar No. 5500
                                                   Independence Law Maine and New
                                                   Hampshire
                                                   P.O. Box 406
                                                   Auburn, ME 04212
                                                   Telephone: (207) 241-9717
                                                   Dov@independencelawmaine.com

                                                   Lynn A. Toops*
                                                   Amina A. Thomas*
                                                   COHENMALAD, LLP
                                                   One Indiana Square, Suite 1400
                                                   Indianapolis, Indiana 46204
                                                   (317) 636-6481
                                                   ltoops@cohenmalad.com
                                                   athomas@cohenmalad.com

                                                   J. Gerard Stranch, IV*
                                                   Emily E. Schiller*
                                                   STRANCH, JENNINGS & GARVEY, PLLC
                                                   223 Rosa L. Parks Avenue, Suite 200
                                                   Nashville, Tennessee 37203
                                                   (615) 254-8801
                                                   (615) 255-5419 (facsimile)
                                                   gstranch@stranchlaw.com
                                                   eschiller@stranchlaw.com

                                                   Samuel J. Strauss*
                                                   Raina C. Borrelli*
                                                   STRAUSS BORRELLI, PLLC
                                                   980 N. Michigan Avenue, Suite 1610
                                                   Chicago, Indiana 60611
                                                   (872) 263-1100

71

(872) 263-1109 (facsimile)
sam@straussborrelli.com
raina@straussborrelli.com

\* to seek admission *pro hac vice*

**Counsel for Plaintiffs and the Proposed Classes**