**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| MICHAEL LESSNER AND DANIEL MOORE, Individually and on behalf of all other similarly situated,<br><br>Plaintiffs<br><br>v.<br><br>CAMDEN NATIONAL BANK<br><br>Defendant | **CASE NO.: 2:25-cv-00109-SDN** |

**DEFENDANT'S MOTION TO STAY AND COMPEL ARBITRATION, OR IN THE ALTERNATIVE MOTION TO DISMISS**

## TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES ........ iii

I. THE COURT SHOULD COMPEL ARBITRATION. ........ 1

A. Procedural History ........ 1

B. Factual Background ........ 1

1. Plaintiff Michael Lessner's Relationship with CNB. ........ 2

2. Plaintiff Daniel Moore's Relationship with CNB. ........ 6

C. Plaintiffs' Claims Are Subject to Binding Arbitration Pursuant to the FAA ........ 8

1. A Written Agreement to Arbitrate Exists. ........ 9

a. Plaintiff Michael Lessner's Agreements to Arbitrate ........ 10

i. The Arbitration Agreement in the May 2021 Disclosure Package. ........ 10

ii. Lessner's Online Arbitration Agreement ........ 12

b. Plaintiff Daniel Moore's Agreement to Arbitrate ........ 16

2. Plaintiffs' Claims Fall Within the Scope of the Arbitration Agreement. ........ 17

3. CNB Has Not Waived Its Right to Arbitrate. ........ 18

II. ALTERNATIVELY, THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS. ........ 19

A. Facts as Alleged in Amended Complaint ........ 19

B. Legal Standard ........ 21

1. Dismissal is Warranted Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for Failure to Plead Legally Cognizable Injury. ........ 22

2. Dismissal is Warranted for Failure to Plausibly Connect CNB's Use of Tracking Technologies to Disclosure of Plaintiffs' Information. ........ 24

3. Plaintiffs' Claims Fail on the Merits ........ 25

CONCLUSION ........ 30




#18279200v15

CERTIFICATE OF SERVICE ........................................................................................................ 32

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Allen v. Quicken Loans Inc.*,
2018 WL 5874088 (D.N.J. Nov. 9, 2018) .......... 29, 30

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 22

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) .......... 8, 19

*Attias v. CareFirst, Inc.*,
365 F. Supp. 3d 1 (D.D.C. 2019) .......... 22

*Bangor Hydro-Electric Co. v. New England Tel. & Tel. Co.*,
62 F. Supp. 2d 152 (D. Me. 1999) .......... 9

*Bathe v. Key Bank*,
2021 WL 5167677 (Me. B.C.D. Sept. 29, 2021) .......... 29

*Bathe v. KeyBank N.A.*,
2021 WL 6125321 (Me. B.C.D. Nov. 23, 2021) .......... 23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 22

*Binette v. Dyer Libr. Ass'n*,
688 A.2d 898 (Me. 1996) .......... 26

*Bosse v. N.Y. Life Ins. Co.*,
992 F.3d 20 (1st Cir. 2021) .......... 18

*Buck v. Am. Airlines, Inc.*,
476 F.3d 29 (1st Cir. 2007) .......... 29

*Chabot v. Spectrum Healthcare Partners, P.A.*,
2021 WL 659565 (Me. B.C.D. Jan. 14, 2021) .......... 23, 29

*Combined Energies v. CCI, Inc.*,
514 F.3d 168 (1st Cir. 2008) .......... 9

*Cousin v. Sharp Healthcare*,
2023 WL 4484441 (S.D. Cal. July 12, 2023) .......... 24

*Culebra II, LLC v. River Cruises & Anticipation Yachts, LLC*,
564 F. Supp. 2d 70 (D. Me. 2008) .......... 24



#18279200v15

Page(s)

*Cullinane v. Uber Techs., Inc.*,
893 F.3d 53 (1st Cir. 2018) ........................................ *passim*

*Curtis v. Porter*,
2001 ME 158, 784 A.2d 18 ........................................ 24

*Curtis v. Ryder Truck Rental, Inc.*,
2006 WL 662395 (D. Me. Mar. 13, 2006) ........................................ 26

*Daigle v. Pelletier*,
139 Me. 382, 31 A.2d 345 (1943) ........................................ 29

*Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.*,
638 F.3d 367 (1st Cir. 2011) ........................................ 9, 17

*Fawcett v. Citizens Bank, N.A.*,
297 F. Supp. 3d 213 (D. Mass. 2018) ........................................ 10

*Foley v. Wells Fargo Bank, N.A.*,
772 F.3d 63 (1st Cir. 2014) ........................................ 20

*FPE Found. v. Cohen*,
801 F.3d 25 (1st Cir. 2015) ........................................ 18

*Francis v. Stinson*,
2000 ME 173, 760 A.2d 209 ........................................ 16

*Gonzales v. Sweetser*,
2020 WL 6596389 (Me. B.C.D. Oct. 13, 2020) ........................................ 22, 23

*Good v. Uber Techs., Inc.*,
234 N.E.3d 262 (Mass. 2024) ........................................ 14

*Grand Wireless, Inc. v. Verizon Wireless, Inc.*,
748 F.3d 1 (1st Cir. 2014) ........................................ 17

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ........................................ 27

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
586 U.S. 65 (2019) ........................................ 9, 18

*Hill v. Gateway 2000, Inc.*,
105 F.3d 1147 (7th Cir. 1997) ........................................ 12

*Hochendoner v. Genzyme Corp.*,
823 F.3d 724 (1st Cir. 2016) ........................................ 24



#18279200v15

Page(s)

*Hudson v. S.D. Warren Co.*,
608 F. Supp. 477 (D. Me. 1985) ........................................................................ 26

*In re Hannaford Bros. Co. Data Sec. Breach Litig.*,
2010 ME 93, 4 A.3d 492 .................................................................................. 23

*Jane Doe v. Eastern Me. Healthcare Sys.*,
Docket No. BCD-CIV-2024-31 (Me. B.C.D. Jan. 9, 2025)................................ 23

*June Roberts Agency, Inc. v. Venture Props, Inc.*,
676 A.2d 46 (Me. 1996).................................................................................... 28

*Katz v. Pershing, LLC*,
672 F.3d 64 (1st Cir. 2012) .............................................................................. 23

*Khath v. Midland Funding LLC*,
334 F. Supp. 3d 499 (D. Mass 2018) ................................................................ 11

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)........................................................................................... 22

*Meckel v. Continental Res. Co.*,
758 F.2d 811 (2d Cir. 1985) ............................................................................. 11

*Meyer v. Uber Techs., Inc.*,
868 F.3d 66 (2d Cir. 2017) ...................................................................... 13, 14, 15

*Motor Fin. Co. v. Noyes*,
139 Me. 159, 28 A.2d 235 (1942)..................................................................... 22

*Narragansett Indian Tribe v. Warwick Sewer Auth.*,
334 F.3d 161 (1st Cir. 2003) ............................................................................ 11

*Nelson v. Me. Times*,
373 A.2d 1221 (Me. 1977)................................................................................. 22

*O'Brien v. DiGrazia*,
544 F.2d 543 (1st Cir. 1976) ............................................................................ 24

*O'Shea v. Littleton*,
414 U.S. 488 (1974)........................................................................................... 21

*Paffhausen v. Balano*,
1998 ME 47, 708 A.2d 269 ............................................................................... 22

*Peter v. Doordash, Inc.*,
445 F. Supp. 3d 580 (N.D. Cal. 2020) .............................................................. 15



#18279200v15

Page(s)

*Rivera-Colon v. AT&T Mobility P.R., Inc.*,
913 F.3d 200 (1st Cir. 2019) .......... 9

*Rosenthal v. Walker*,
111 U.S. 185 (1884) .......... 11

*Rush v. Me. Sav. Bank*,
387 A.2d 1127 (Me. 1978) .......... 26

*Sandler v. Calcagni*,
565 F. Supp. 2d 184 (D. Me. 2008) .......... 26

*Sarchi v. Uber Techs., Inc.*,
2022 ME 8, 268 A.3d 258 .......... *passim*

*Scherk v. Alberto-Culver Co.*,
417 U.S. 506 (1974) .......... 8, 9

*Selden v. Airbnb, Inc.*,
4 F.4th 148, (D.C. Cir. 2021) .......... 15

*Shah v. Capital One Fin. Corp.*,
768 F. Supp. 3d 1033 (N.D. Cal. 2025) .......... 28, 30

*Snow v. Eventbrite, Inc.*,
2020 WL 6135990 (N.D. Cal. Oct. 19, 2020) .......... 15

*State v. Cannady*,
2018 ME 106, 190 A.3d 1019 .......... 11

*State v. Kovtuschenko*,
521 A.2d 718 (Me. 1987) .......... 11

*Stevens v. TD Bank. N.A.*,
Docket No. 24-cv-08311-RMB-AMD (D.N.J. June 27, 2025) .......... 25

*Stokes v. Barnhart,*
257 F. Supp. 2d 288 (D. Me. 2003) .......... 26

*T.D. v. Piedmont Healthcare, Inc.*,
2024 WL 3972984 (N.D. Ga. Aug. 28, 2024) .......... 23

*Tobin v. Barter*,
2014 ME 51, 89 A.3d 1088 .......... 22

*Toddle Inn Franchising, LLC v. KPJ Associates, LLC*,
8 F.4th 56 (1st Cir. 2021) .......... 18

Page(s)

*Toth v. Everly Well, Inc.*,
118 F.4th 403 (1st Cir. 2024) .................... 13, 15, 19

*U.S. Fire Ins. Co. v. Producciones Padosa, Inc.*,
835 F.2d 950 (1st Cir. 1987) .................... 11

*United States v. Forrester*,
512 F.3d 500 (9th Cir. 2008) .................... 27

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
363 U.S. 574 (1960) .................... 17

*V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co.*,
2001 ME 73, 770 A.2d 95 .................... 17

*Warth v. Seldin*,
422 U.S. 490 (1975) .................... 21

*Wawenock, LLC v. Dep't of Transp.*,
2018 ME 83, 187 A.3d 609 .................... 29

*York Cty. v. PropertyInfo Corp.*,
2019 ME 12, 200 A.3d 803 .................... 28

*Zajac, LLC v. Walker Industrial*,
2016 WL 3962830 (D. Me. July 21, 2016) .................... 29

**STATUTES**

9 U.S.C. § 2 .................... 8

9 U.S.C. § 4 .................... 8

18 U.S.C. § 1030 .................... 21, 22

18 U.S.C. § 2510(15) .................... 30

18 U.S.C. § 2511 .................... 21, 29, 30

18 U.S.C. § 2702 .................... 21

18 U.S.C. § 2707(c) .................... 22

9-B M.R.S. § 161, *et seq*. .................... 21

9-B M.R.S. § 162 .................... 29

9-B M.R.S. § 466 .................... 29



#18279200v15

Page(s)

**RULES**

Fed. R. Civ. P. 12(b) ........................................ 1, 22

Fed. R. Civ. P. 23 ........................................ 1

**OTHER AUTHORITIES**

Field & Murray, *Maine Evidence* § 301.2 (6th ed. 2007) ........................................ 11

Defendant Camden National Bank ("CNB") moves for an Order staying these proceedings and compelling Plaintiffs Michael Lessner and Daniel Moore to arbitrate their individual claims against CNB as set forth in Plaintiffs' Amended Complaint. In the alternative, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), CNB moves to dismiss all claims brought by Plaintiffs.

## I. THE COURT SHOULD COMPEL ARBITRATION.

### A. Procedural History

On March 26, 2025, Plaintiff Lessner filed a complaint (ECF No. 1) on behalf of a putative class under Fed. R. Civ. P. 23, alleging various Maine common law and federal statutory claims related to CNB's alleged use of various tracking technologies on CNB's website ("Website") when he allegedly applied for and received a CNB credit card. (*See* ECF No. 1.) On June 5, 2025, Plaintiffs filed their Amended Class Action Complaint ("Complaint") (ECF No. 10), which adds Plaintiff Daniel Moore as a named plaintiff in this putative class action. Plaintiffs' Complaint, similarly, alleges claims under Maine common and statutory law, as well as federal statutory law, related to CNB's alleged use of tracking technologies on the Website that allegedly harmed Plaintiffs as banking customers of CNB. Specifically, Plaintiffs allege that CNB used these tracking technologies to collect and disclose Plaintiffs' personal and financial information to third parties uninvolved in the provision of CNB's financial services to Plaintiffs. Compl., ¶¶ 1-4.

Given Plaintiffs' agreement to arbitrate all claims related to their relationship with CNB and Plaintiffs' waiver of their rights to bring a class action, CNB now moves to compel arbitration.

### B. Factual Background

The facts are drawn from the Complaint and documents submitted with CNB's Motion to Stay and Compel Arbitration. *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 55 (1st Cir. 2018).

### 1. Plaintiff Michael Lessner's Relationship with CNB.

Plaintiff Michael Lessner became a customer of CNB in September 2012, when he opened a savings account. Declaration of Suzanne Cifaldo ("Cifaldo Dec.") ¶ 5. Lessner's savings account was subsequently closed on April 29, 2014. *Id.* ¶ 6.

On February 19, 2019, Lessner opened a checking account with CNB in person at a CNB branch and also enrolled in CNB's online banking. *Id.* ¶¶ 7-8, Ex. A ("Lessner Account Agreement"). At account opening, Lessner signed his Account Agreement, which included the following:

> **AMENDMENTS AND ALTERATIONS.** You agree that the terms and conditions governing your account may be amended by us from time to time. We will notify you of amendments as required by applicable law. Your continued use of the account evidences your agreement to any amendments. Notices will be sent to the most recent address shown on the account records. . . .

*Id.* ¶ 9, Ex. A at 7. Although Lessner alleges that he applied for and received a CNB credit card in 2019, Comp. ¶ 135, CNB does not and has never accepted applications for credit cards on its Website and does not and has never issued credit cards through its Website. *Id.* ¶ 33.[1]

On May 3, 2021, pursuant to its authority under Lessner's Account Agreement, CNB updated the terms applicable to customers' banking accounts and mailed all account customers, including Lessner, a disclosure package detailing those updated terms. *Id.* ¶ 10, Ex. B ("Disclosure Package"). The front page of the Disclosure Package stated, "Please carefully review the enclosed

---

[1] CNB does offer access to credit card applications through its Website, which transfers users to a different financial institution where they can select a CNB branded credit card. Cifaldo Dec. ¶ 33. Prior to being transferred to the credit card application outside of CNB's Website, however, the Website incorporates a "speed bump" or pop-up preventing users from being transferred prior to affirmatively consenting to proceed to another site. *Id.* ¶ 34. Specifically, the pop-up states:

> You will be linking to another website not owned or operated by Camden National Bank. Camden National Bank is not responsible for the availability or content of this website and does not represent either the linked website or you, should you enter into a transaction. We encourage you to review their privacy and security policies which may differ from Camden National Bank.

*Id.* Website users are not transferred to the other financial institution's site unless they affirmatively select to "Proceed." *Id.* Alternatively, Website users can opt to "Cancel" and return to CNB's Website. *Id.*

account booklet, as well as the Notice of Change in Terms Governing Your Checking Account(s). These two documents explain the details of your new account, highlight some of the changes from your prior account, and outline changes to the terms governing your account." *Id.*, Ex. B at 1.[2]

Relevant here, the Disclosure Package mailed to Lessner in May 2021, included a document titled, in bold, "**ALTERNATIVE DISPUTE RESOLUTION ADDENDUM TO DEPOSIT ACCOUNT AGREEMENT. AGREEMENT TO ARBITRATE; JURY TRIAL WAIVER AND CLASS ACTION WAVIER.**" *Id.* ¶ 15, Ex. B at 31 ("the Alternative Dispute Resolution Addendum"). The Alternative Dispute Resolution Addendum specifically states,

> This section of your deposit account agreement constitutes the Arbitration Agreement between you and us. **READ THIS SECTION CAREFULLY AS IT AFFECTS HOW LEGAL DISPUTES BETWEEN YOU AND US ARE RESOLVED. IF YOU DO NOT OPT OUT AS PROVIDED BELOW, ALL DISPUTES BETWEEN YOU AND US WILL BE SUBJECT TO BINDING INDIVIDUAL ARBITRATION.**

*Id.* ¶ 16, Ex. B at 31. The Addendum further states, "**YOU AGREE TO WAIVE ANY RIGHT YOU MAY HAVE TO BRING A CLASS ACTION OR OTHER REPRESENTATIVE ACTION AGAINST US OR TO PARTICIPATE IN A CLASS ACTION OR OTHER REPRESENTATIVE ACTION BROUGHT BY SOMEONE ELSE**." *Id.* ¶ 17, Ex. B at 31.

With respect to the scope of the Arbitration Agreement, it provides:

> **Disputes Covered.** The term "Dispute" includes any and all claims, disputes, actions or other controversies, whether based in contract, tort, statute, fraud or any other legal or equitable theory, that arise out of or are related to this deposit account agreement; your account; any transaction, service, product, fee, or offer related to your account; or any other aspect of the relationship between us. Disputes subject

[2] CNB followed its standard practices for mailing the Disclosure Package. Cifaldo Dec. ¶ 13. Namely, CNB employee Jared Merritt pulled customer data from its software Core and formatted that data into an excel spreadsheet mail merge file. *Id.* The mail merge file was provided to CNB's printing vendor, Creative Imaging Group, by CNB employee Jamie Bowden. *Id.* The file was then mail merged onto customer letters, and Creative Imaging Group printed the customer letters and disclosure packages, and used a machine to stuff them into window envelopes. *Id.* Once all envelopes were stuffed, the vendor delivered the envelopes to the U.S. Post Office located in Scarborough, Maine. *Id.* Creative Imaging Group sent proof of mailing back to Jamie Bowden, which included pdf versions of the individual customer letters. *Id.* Those pdf versions were then stored in CNB's document archive system, Synergy, at the individual customer profile level. *Id.*

> to arbitration include those based on present, future or past events (including events that occurred before the effective date of this deposit account agreement addendum or any earlier agreement governing the terms and conditions of your account), whether asserted as original claims, counterclaims, cross-claims, third-party claims, interpleaders, or in any other form. Notwithstanding the above, this Arbitration Agreement will not apply to any action (including any putative class action) filed in a court of competent jurisdiction on or before May 3, 2021.

*Id.* ¶ 18, Ex. B at 32. The Arbitration Agreement further delegates all questions as to scope to the arbitrator in the first instance: "The arbitrator shall have exclusive authority to resolve any disagreement or controversy relating to the validity, interpretation, scope or enforcement of this Arbitration Agreement, or any other part or term of this deposit account agreement, or the existence or validity of this deposit account agreement as a whole . . . ." *Id.* ¶ 19, Ex. B at 32.

As provided in the Alternative Dispute Resolution Addendum, Lessner had the opportunity to opt-out of the Arbitration Agreement:

> **YOUR RIGHT TO OPT OUT**. You have the right to opt out of this Arbitration Agreement, and doing so will not affect any other terms of this deposit account agreement or your relationship with us. **TO OPT OUT OF THIS ARBITRATION AGREEMENT FOR ACCOUNTS OPENED ON OR BEFORE MAY 3, 2021, YOU MUST MAIL US WRITTEN NOTICE OF YOUR DECISION, POSTMARKED BY JUNE 7, 2021.** For accounts opened after May 3, 2021, you must mail us written notice of your opt-out decision, postmarked within 30 days of opening your account. . . . This is the sole and only method by which you can opt out of this Arbitration Agreement.

*Id.* ¶ 20, Ex. B at 31. Plaintiff Michael Lessner did not exercise his right to opt out of the Arbitration Agreement. Cifaldo Dec. ¶ 21.

In July 2023, CNB updated its Consumer Online Banking Agreement. *Id.* ¶ 22. After that date, the first time a customer—*e.g.*, Lessner—logged onto CNB's online banking, a pop-up screen appeared with the updated agreement. The pop-up stated:

> **Existing Online Banking Customers:**
> We have made significant revisions to our Online Banking Agreement. This new Agreement will be effective 30 days from your acceptance. If you do not wish to accept the revised Agreement you must terminate your online banking access,

> otherwise, your continued use will constitute your acceptance 30 days from today. Please read through this updated agreement thoroughly to ensure you understand it. A high-level summary of the changes is as follows:
>
> - For checking account customers, acknowledgment of receipt and review of the Deposit Account Agreement and the Alternative Dispute Resolution Addendum – that you agree to the terms and conditions of both agreements (including without limitation the Agreement to Arbitrate, Jury Trial Waiver, and Class Action Waiver provisions)
> - **Agreement to Arbitrate; Jury Trial Waiver and Class Action Waiver.** Any claim arising out of or relating to this Agreement concerning or in connection with any Camden National Bank deposit account receiving services under this Agreement is subject to the Agreement to Arbitrate, Jury Trial Waiver, and Class Action Waiver provisions set forth in the Alternative Dispute Resolution Addendum to our Deposit Account Agreement. You and we agree that the terms of the Deposit Account Agreement (including but not limited to the Alternative Dispute Resolution Addendum provisions) are expressly incorporated by reference and made a part of this Agreement. …

Cifaldo Dec. ¶ 23, Ex. C ("Consumer Online Banking Agreement"). Online banking customers were required to scroll through the Consumer Online Banking Agreement and click "I Accept" to proceed with online banking on CNB's website. *Id.* ¶ 24. Alternatively, if a customer clicked "I Do Not Accept" after scrolling through the Consumer Online Banking Agreement, the customer's online banking access would be discontinued. *Id.* According to CNB's records, Plaintiff Lessner affirmatively clicked "I Accept" to the updated Consumer Online Banking Agreement on July 5, 2023 at 2:31 PM, acknowledging that the Arbitration Agreement from May 2021 was incorporated into that agreement. *Id.* ¶ 25. Lessner's February 2019 checking account was subsequently closed on August 23, 2023. *Id.* ¶ 26.

A week before, on August 18, 2023, Lessner opened a new checking account online with CNB, which remains active. *Id.* ¶ 27. In order to complete Lessner's application to open a checking account online, Lessner was required to read a disclosure that stated:




*Id.* ¶ 28. After affirmatively checking the grey box in the middle of the hyperlinked agreements, Lessner clicked "I Agree" to open his online account on August 18, 2023. *Id.* ¶ 30. The Alternative Dispute Resolution Addendum to Deposit Account Agreement hyperlink is the same Addendum—with the same Arbitration Agreement and class action waiver provisions—that Lessner received in his May 2021 Disclosure Package. *Id.* ¶ 31. Again, Lessner did not opt-out. *Id.* ¶ 32.

### 2. Plaintiff Daniel Moore's Relationship with CNB.

On November 14, 2024, Plaintiff Daniel Moore opened a CNB checking account in CNB's Waterville branch. Cifaldo Dec. ¶ 35.[3] At account opening, Moore received and executed his Account Agreement, which acknowledged that Moore opened an account with CNB and that Moore received and agreed to be bound by the terms of the Account Agreement, including the Arbitration Agreement. *Id.* ¶ 36, Ex. D ("Moore Account Agreement"). Specifically, Moore's

[3] The Complaint states that Plaintiff Moore opened his checking account online in October 2024. Compl. ¶ 139. According to CNB's business records, Moore opened his checking account at CNB's Waterville branch—not online—and thereafter enrolled in online banking related to that checking account. Cifaldo Dec. ¶ 35.

Account Agreement provides, in bold, "**ADDITIONAL TERMS. This Agreement contains an arbitration agreement, a jury trial waiver, a class action and class arbitration waiver. It is important that you read these dispute resolution provisions carefully**." *Id.* ¶ 37, Ex. D at 1. Moore signed his Account Agreement on November 14, 2024, which signature acknowledged that he had received and agreed to be bound by the Alternative Dispute Resolution Addendum to Deposit Account Agreement, which included an Arbitration Agreement. *Id.* ¶¶ 35-36, Ex. D at 1, 29-31. The Arbitration Agreement in Moore's Account Agreement is substantively identical to the Arbitration Agreement in Lessner's Disclosure Package. *Id.* ¶ 38. Like Lessner, Moore did not exercise his right to opt-out of the Arbitration Agreement. *Id.* ¶ 39.

On December 18, 2024, Moore successfully enrolled in CNB's online banking. *Id.* ¶ 40. After setting a password but before being directed to CNB's online banking landing page, Moore would have been directed to CNB's Consumer Online Banking Agreement. *Id.* For newly enrolled banking customers, the Consumer Online Banking Agreement states: "New Enrollment: If this is your first time enrolling in online banking, **this Agreement is effective immediately.** Please read through this agreement in its entirety and save a copy for your records." *Id.* ¶ 41, Ex. C. The Consumer Online Banking Agreement incorporates CNB's Master Online Banking Agreement, effective as of July 2023, which states, in bold, "**Please read this document carefully and print or save a copy for your reference."** *Id.* ¶ 42, Ex. C at 2. The Master Online Banking Agreement also states: "**BY ACCESSING THE ONLINE SYSTEM, YOU AGREE TO BE BOUND BY THE TERMS AND CONDITIONS BELOW.** IF YOU DO NOT AGREE WITH THESE TERMS AND CONDITIONS, DO NOT USE THE ONLINE SYSTEM." *Id.* And, relevant here, further states:

> For checking account customers: You acknowledge that you received and reviewed the Deposit Account Agreement and the Alternative Dispute Resolution Addendum



#18279200v15

> to Deposit Account Agreement. You agree that the terms and conditions of those other agreements (including without limitation the Agreement to Arbitrate, Jury Trial Waiver, and Class Action Waiver provisions) are incorporated by reference and made a part of this Agreement.

*Id.* ¶ 43, Ex. C at 2. The Master Online Banking Agreement goes on to state:

> **Agreement to Arbitration; Jury Trial Waiver and Class Action Waiver.** Any claim arising out of or relating to this Agreement concerning or in connection with any Camden National Bank deposit account receiving services under this Agreement is subject to the Agreement to Arbitrate, Jury Trial Waiver, and Class Action Waiver provisions set forth in the Alternative Dispute Resolution Addendum to our Deposit Account Agreement. You and we agree that the terms of the Deposit Account Agreement (including but not limited to the Alternative Dispute Resolution Addendum provisions) are expressly incorporated by reference and made a part of this Agreement.

*Id.* ¶ 44, Ex. C at 19-20. According to CNB's records, Plaintiff Moore affirmatively clicked "I Accept" to the Consumer Online Banking Agreement on December 18, 2024 at 2:16 PM, acknowledging that the Arbitration Agreement he received the previous month, in paper, was specifically incorporated into that Consumer Online Banking Agreement. Cifaldo Dec. ¶¶ 43-45.

### C. Plaintiffs' Claims Are Subject to Binding Arbitration Pursuant to the FAA.

Under the Federal Arbitration Act ("FAA"), "[a] written provision in any . . . contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement" may petition the Court "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4.

"The Supreme Court has stated that the FAA reflects 'a federal liberal policy favoring arbitration agreements.'" *Cullinane*, 893 F.3d at 60 (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011) ("*Concepcion*")). It was Congress's intent to "place arbitration agreements 'upon the same footing as other contracts.'" *Id.* (quoting *Scherk v. Alberto-Culver Co.*,

417 U.S. 506, 511 (1974)). Thus, "[t]he FAA allows one party to an arbitration agreement to ask the court to put the litigation on hold and force the other party to arbitrate the dispute." *Rivera-Colon v. AT&T Mobility P.R., Inc.*, 913 F.3d 200, 207 (1st Cir. 2019). "At base, it respects arbitration as 'a matter of contract' between parties and doesn't allow courts to jump in when the parties agreed to keep the courts out of the mix." *Id.* (citing *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 65-66 (2019)).

Federal courts within the First Circuit will compel arbitration pursuant to the FAA when "(i) there exists a written agreement to arbitrate, (ii) the dispute falls within the scope of that arbitration agreement, and (iii) the party seeking an arbitral forum has not waived its right to arbitration." *Combined Energies v. CCI, Inc.*, 514 F.3d 168, 171 (1st Cir. 2008) (quoting *Bangor Hydro-Electric Co. v. New England Tel. & Tel. Co.*, 62 F. Supp. 2d 152, 155 (D. Me. 1999)). Applying the above factors, arbitration of Plaintiffs' claims is required pursuant to the FAA.

**1. A Written Agreement to Arbitrate Exists.**

In determining whether Plaintiffs and Defendant formed a written agreement to arbitrate, Maine law applies. *See Dialysis Access Ctr., LLC v. RMS Lifeline, Inc.,* 638 F.3d 367, 376 (1st Cir. 2011) ("When deciding whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."). Under Maine law, "[a] contract exists when the parties mutually assent to be bound by all its material terms [and] the assent is either expressly or impliedly manifested in the contract." *Sarchi v. Uber Techs., Inc.*, 2022 ME 8, ¶ 15, 268 A.3d 258. Under Maine contract law, "a party need not actually have read the terms of the contract in order to be bound by them." *Id.* Online contracts are governed by the "same principles as traditional contracts." *Id.* ¶ 16 (citing *Cullinane*, 893 F.3d at 61).



#18279200v15

Plaintiff Lessner entered into two agreements containing mandatory arbitration and class action waiver provisions: one on paper, which was incorporated into and reaffirmed in a subsequent online agreement when Lessner continued to use CNB's online banking, and one online when he opened a new checking account with CNB. Plaintiff Moore entered into one physical, paper agreement containing mandatory arbitration and class action waiver provisions, which was incorporated into and reaffirmed in a subsequent online agreement when Moore enrolled in online banking. Through multiple interactions with CNB—in person and online—Plaintiffs were provided with reasonable, conspicuous notice of the Arbitration Agreement and had the opportunity to review the agreement and opt-out. On every occasion, Plaintiffs affirmatively accepted the contractual terms provided by CNB and did not exercise their rights to opt-out under the Arbitration Agreement. Plaintiffs are thus bound by the arbitration forum.

**a. Plaintiff Michael Lessner's Agreements to Arbitrate**

i. <u>The Arbitration Agreement in the May 2021 Disclosure Package.</u>

On May 3, 2021, pursuant to its authority under Lessner's Account Agreement executed in 2019 to amend the terms of the Account Agreement from time to time, CNB updated the terms applicable to customers' accounts and mailed all customers, including Lessner, notice of those updated terms in the Disclosure Package, including the Alternative Dispute Resolution Addendum and Arbitration Agreement. *See Fawcett v. Citizens Bank, N.A.*, 297 F. Supp. 3d 213, 220 (D. Mass. 2018) (finding that by signing an account agreement with the bank "which provided that she agreed to be bound by the [deposit agreement], as amended and in effect from time to time," the plaintiff "expressly agreed to be bound by subsequent amendments to the [agreement]"). Lessner received notice of those account changes, including the Arbitration Agreement. It is well settled that "if a letter properly directed is proved to have been either put into the post-office or delivered to the



#18279200v15

postman, it is presumed, from the known course of business in the post-office department, that it reached its destination at the regular time, and was received by the person to whom it was addressed." *Rosenthal v. Walker*, 111 U.S. 185, 193 (1884); Cifaldo Dec. ¶¶ 10-11, 14. Since *Rosenthal*, federal and state courts, including the First Circuit, routinely apply this common law presumption, known as the "mailbox rule," that properly mailed documents are received in due course by the addressee or after a normal interval (*e.g.*, two or three days). *See Narragansett Indian Tribe v. Warwick Sewer Auth.*, 334 F.3d 161, 168 (1st Cir. 2003) (Tribe failed to rebut common law presumption when Authority testified that documents were mailed with return addresses and were never returned); *Khath v. Midland Funding LLC*, 334 F. Supp. 3d 499, 514-15 (D. Mass 2018) (applying presumption of receipt to prove existence of agreement). Maine courts, similarly, apply the presumption of receipt. *See State v. Cannady*, 2018 ME 106, ¶ 14, 190 A.3d 1019; *see also* Field & Murray, *Maine Evidence* § 301.2 at 64 (6th ed. 2007) ("[A] [l]etter deposited in the mail properly addressed and stamped is presumed to have been received.").

To rebut this presumption, a party typically must provide "some proof that the regular office practice was not followed or was carelessly executed so the presumption that notice was mailed becomes unreasonable." *Meckel v. Continental Res. Co.*, 758 F.2d 811, 817 (2d Cir. 1985) (cited by the First Circuit in *U.S. Fire Ins. Co. v. Producciones Padosa, Inc.*, 835 F.2d 950, 952 n.2 (1st Cir. 1987)). A party's "mere denial of receipt does not rebut that presumption." *Meckel*, 758 F.2d at 817; *State v. Kovtuschenko*, 521 A.2d 718, 719 (Me. 1987) (stating that denial of receipt is insufficient to generate reasonable doubt on the element of mailing).

Applying the "mailbox rule," the Disclosure Package with the Alternative Dispute Resolution Addendum and Arbitration Agreement addressed to Lessner is presumed to have reached its destination at Lessner's address at 67 Evergreen Estates Road, Nobleboro, Maine.

Cifaldo Dec. ¶¶ 10-11. Further, CNB has no record of Lessner's Disclosure Package, including the Arbitration Agreement, being returned as undeliverable. *Id.* ¶ 14. Nor does CNB have any written notice that Lessner exercised his right to opt-out of the Arbitration Agreement upon receipt of the Disclosure Package, pursuant to its terms. *Id.* ¶ 21. It is of no moment that Lessner may have failed to read the Arbitration Agreement, including the class action waiver. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148-49 (7th Cir. 1997) ("A contract need not be read to be effective; . . . Competent adults are bound by such documents, read or unread."). What is important is that Lessner had the *opportunity* to review the Arbitration Agreement and opt-out if he did not want to be bound by its terms. *Id.* He did not. Cifaldo Dec. ¶¶ 20-21.

To the extent there was any doubt, Lessner reaffirmed his receipt and acknowledgement of the Arbitration Agreement when he agreed to the updated Consumer Online Banking Agreement in July 2023. *Id.* ¶¶ 23-25. There, prior to being able to proceed to CNB's online banking portal, Lessner had to scroll through the updated Consumer Online Banking Agreement, which expressly notified Lessner, in bold, of the "**Agreement to Arbitration; Jury Trial Waiver and Class Action Waiver**." *Id.* ¶ 23, Ex. C. The updated Consumer Online Banking Agreement stated that the Arbitration Agreement in his Disclosure Package was expressly incorporated by reference and made part of the Consumer Online Banking Agreement. *Id.* Thus, once again, Lessner was provided with an opportunity to review the Arbitration Agreement before affirmatively proceeding to the online portal. On July 5, 2023, at 2:31 PM, Lessner clicked "I Accept" to the terms outlined on CNB's Website, including the incorporated Arbitration Agreement. *Id.* ¶ 25.

ii. Lessner's Online Arbitration Agreement

Lessner entered into a second Arbitration Agreement when opening a new checking account through CNB's online portal in August 2023. While doing so, Lessner was confronted



#18279200v15

with a disclosure prior to submitting his online application that stated "**I/We agree to the Electronic Records Disclosure as well as the Terms and Conditions of the following agreements, and understand that this is the only opportunity to save and print these documents and disclosures prior to the account being opened.**" Cifaldo Dec. ¶ 28. One of those hyperlinked agreements was the Alternative Dispute Resolution Addendum—the same addendum provided in the May 2021 Disclosure Package—which included the Arbitration Agreement and class action waiver. This is a classic "clickwrap" agreement, in which the terms of an agreement are displayed, at least in part, on a user's computer screen and the user is required to signify his or her assent by "clicking" a designated button. *See Toth v. Everly Well, Inc.*, 118 F.4th 403, 413 (1st Cir. 2024). Courts in Maine and the First Circuit, as well as others, uniformly agree that such clickwrap agreements are valid and enforceable because they are the "clearest manifestations of assent" to the terms of the contract, including arbitration provisions. *Id.*; *see Sarchi*, 2022 ME 8, ¶ 20, 268 A.3d 258 ("[C]ourts generally uphold clickwrap agreements.").

In determining the enforceability of online agreements, including clickwrap agreements, courts generally conduct a two-step inquiry. *Sarchi*, 2022 ME 8, ¶ 25, 268 A.3d 258; *Cullinane*, 893 F.3d at 62. "The first step focuses on whether a user had reasonable notice of the online contract terms 'considering the perspective of a reasonably prudent . . . user' of online technology." *Sarchi*, 2022 ME 8, ¶ 26, 268 A.3d 258 (quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 77 (2d Cir. 2017)); *see Cullinane*, 893 F.3d at 62 (analyzing whether "terms were reasonably communicated" to the user). "Whether an interface provides reasonable notice of the terms of an online contract . . . is essentially a function of how likely the terms and conditions themselves, or a hyperlink to them, are to come to the attention of the reasonably prudent user." *Sarchi*, 2022 ME 8, ¶ 26, 268 A.3d 258. Thus, courts generally look to the layout and language of the site in

determining reasonable notice: *e.g.*, the conspicuousness of hyperlinks to the relevant terms, *compare Meyer*, 868 F.3d at 78-79, 81-82 (reasonable notice found and arbitration agreement enforceable when hyperlinks were in blue and placed closely to the "REGISTER" button), *with Cullinane*, 893 F.3d at 63 (reasonable notice not found when Terms of Service hyperlink did not have the common appearance of a hyperlink, was cluttered with multiple other provisions on the screen, and was grayed out with white text); clear identification on the online interface that the user is engaging with and being bound by "Terms and Conditions," *compare Cullinane*, 893 F.3d at 64 (inconspicuous when disclosure that hyperlinked terms would bind users was in "dark gray small-sized non-bolded font against a black background"), *with Good v. Uber Techs., Inc.*, 234 N.E.3d 262, 284 (Mass. 2024) (finding Uber interface sufficiently "focused the user on the terms and conditions," thereby "notify[ing] the user that there are terms to which the user will be bound" (quoting another source)); whether the hyperlinks to agreement terms appear on an interface that is uncluttered with other features and thus easily spotted, *see, e.g.*, *Meyer*, 868 F.3d at 78 ("The entire screen is visible at once, and the user does not need to scroll beyond what is immediately visible to find notice of the Terms of Service.").

"If the user received reasonable notice of the terms of the online contract, the analysis moves to the second step—whether the user has manifested assent to the terms." *Sarchi*, 2022 ME 8, ¶ 28, 268 A.3d 258; *see Cullinane*, 893 F.3d at 62. Under Maine law, "the question of assent often comes down to whether the website adequately informs the user that conduct such as clicking on a button constitutes assent to contract terms so as to justify an inference that the user intends to be bound." *Sarchi*, 2022 ME 8, ¶ 28, 268 A.3d 258.

Here, both inquiries are easily satisfied. First, CNB's entire online interface comports with all facets of the reasonable notice inquiry: the entire screen is visible at once, Cifaldo Dec. ¶ 28;

the heading of the screen discloses to "Read, Sign and Submit" and that the user's "**application is not complete until you read the disclosures below and click the "I agree" button in order to submit your application,"** *id.*; the screen is uncluttered by any additional advertisements, links, or promo code boxes, *id.* ¶ 29; and the hyperlinks to the "Terms and Conditions" of the agreements are in blue, underlined text traditionally used to cue users to hyperlinks, against a white background, *id.* ¶ 28. There is simply no straight-faced argument that these terms were not conspicuously communicated to a reasonably prudent user of the internet.[4] *Sarchi*, 2022 ME 8, ¶ 26, 268 A.3d 258. Second, Lessner clearly manifested his assent to these terms. Indeed, Lesser did not just manifest his assent once by clicking "I Agree" in a large, blue box at the bottom of the screen; Lessner manifested his assent *twice*—once by checking the grey box in the center of the various hyperlinked agreements and *again* by clicking "I Agree." *See* Cifaldo Dec. ¶¶ 28, 30; *Toth*, 118 F.4th at 413 (holding defendant "secured meaningful assent" when it required plaintiff "to click the checkbox before creating her account . . . to affirmatively signal their acceptance of the attached terms"); *Meyer*, 868 F.3d at 79-80 (holding user manifested assent given the proximity of the hyperlinked terms to the "REGISTER" button on the interface) (cited as relevant authority in *Sarchi*, 2022 ME 8, ¶ 40, 268 A.3d 258)). Against this backdrop, similarly, there can be no dispute that Lessner formed a second agreement to arbitrate his claims against CNB as of August 2023, and waived his right to participate in this class action. Once again, Lessner did not exercise his right to opt-out of the second Arbitration Agreement. Cifaldo Dec. ¶ 32.

---

[4] *See, e.g.*, *Selden v. Airbnb, Inc.*, 4 F.4th 148, 152, 155-56 (D.C. Cir. 2021) (concluding that there was reasonable notice because the hyperlinked terms appeared in red text on a white background on the uncluttered sign-up screen); *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *7 (N.D. Cal. Oct. 19, 2020) (explaining that the user had reasonable notice of an agreement when the "I accept the terms of service" statement was directly above the "pay now" button and the hyperlink appeared in blue); *Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 582-83, 587 (N.D. Cal. 2020) (concluding that there was reasonable notice where the hyperlink to the terms was blue and underlined).

**b. Plaintiff Daniel Moore's Agreement to Arbitrate**

Plaintiff Moore's written agreement to arbitrate is straightforward. On November 14, 2024, Moore signed and dated his Account Agreement when opening a CNB checking account at the Waterville branch, which Agreement conspicuously notified Moore that it contained arbitration and class action waiver provisions. Cifaldo Dec. ¶¶ 35-37, Ex. D ("**ADDITIONAL TERMS. This Agreement contains an arbitration agreement, a jury trial waiver, a class action and class arbitration waiver. It is important that you read these dispute resolution provisions carefully**."). Thus, from the very outset of his relationship with CNB, Moore was on conspicuous notice of the Arbitration Agreement, and Moore executed a document acknowledging that he "agreed to be bound by the Account Agreement," including the Arbitration Agreement. *See* Cifaldo Dec. ¶ 36, Ex. D at 1; *see Francis v. Stinson*, 2000 ME 173, ¶ 42, 760 A.2d 209 (stating that "parties to a contract are deemed to have read the contract and are bound by its terms"). Like Lessner, Moore did not exercise his right to opt-out of the Arbitration Agreement. Cifaldo Dec. ¶ 39. Thus, like Lessner, Moore formed a written agreement to arbitrate his claims against CNB.

Moore reaffirmed his receipt and acknowledgement of the Arbitration Agreement when he agreed to the Consumer Online Banking Agreement when enrolling in CNB's online banking in December 2024. *Id.* ¶ 40. There, prior to being able to proceed to CNB's online banking portal, Moore had to scroll through the Consumer Online Banking Agreement, which expressly notified Moore, in bold, of the "**Agreement to Arbitration; Jury Trial Waiver and Class Action Waiver**." *Id.* ¶¶ 42-44, Ex. C at 19. The Consumer Online Banking Agreement notified Moore that the Arbitration Agreement in his Account Agreement was expressly incorporated by reference and made part of the Consumer Online Banking Agreement. *Id.* ¶ 43, Ex. C. Thus, once again, Moore was provided with an opportunity to review the Arbitration Agreement before affirmatively

proceeding to the online portal. On December 18, 2024, at 2:16 PM, Moore clicked "I Accept" to the terms outlined on CNB's website, including the incorporated Arbitration Agreement. *Id.* ¶ 45.

**2. Plaintiffs' Claims Fall Within the Scope of the Arbitration Agreement.**

There is a broad presumption in favor of arbitration and any ambiguity concerning the scope of the Arbitration Agreement must be resolved in favor of arbitration. *Grand Wireless, Inc. v. Verizon Wireless, Inc.*, 748 F.3d 1, 7-8 (1st Cir. 2014). To deny CNB's Motion to Compel, this Court must be able to say "with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 8 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960)); *see also V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co.*, 2001 ME 73, ¶ 4, 770 A.2d 95. No such assurance can be found here.

CNB's Arbitration Agreement states that it broadly covers "any and all claims, disputes, actions, or other controversies . . . that arise out of or are related to this deposit account agreement; your account; any transaction, service, product, fee, or offer related to your account; or any other aspect of the relationship between us." Cifaldo Dec. ¶ 18, Ex. B at 32. To determine whether Plaintiffs' claims fall within the scope of the Arbitration Agreement, the Court should "focus on the factual allegations underlying [the] claims in the [c]omplaint." *Dialysis Access Ctr., LLC*, 638 F.3d at 378. *All* of Plaintiffs' allegations arise out of or relate to their financial relationship with CNB. Compl. ¶¶ 134-40 (detailing that each Plaintiff is a "customer" of CNB that used the Website to "facilitate its financial services with" CNB). As such, Plaintiffs' claims fall squarely within the scope of the Arbitration Agreement as they all relate to Plaintiffs' accounts, or products related to Plaintiffs' accounts, or "any other aspect of the relationship" between CNB and Plaintiffs. Cifaldo Dec. ¶ 18; *see Grand Wireless, Inc.*, 748 F.3d at 8 (presuming arbitrability and stating that "where the language of an arbitration clause is broad and in the absence of any express provision excluding

a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." (quotation marks omitted)).

Even if Plaintiffs disputed whether their claims fall within the scope of the Arbitration Agreement, which they plainly do, that is a question to be resolved by the arbitrator—not this Court. Arbitration agreements may include a clause in which the parties agree to delegate issues, including the validity and scope of the agreement itself, to the arbitrator (a "Delegation Clause"). Here, the Arbitration Agreement includes a Delegation Clause, which states that "[t]he arbitrator shall have exclusive authority to resolve any disagreement or controversy relating to the validity, interpretation, scope or enforcement of this Arbitration Agreement . . . ." Cifaldo Dec. ¶ 19, Ex. B at 32. The First Circuit has emphasized that "where the parties 'by clear and unmistakable evidence' delegate issues of arbitrability to the arbitrator, 'the courts must respect the parties' decision as embodied in the contract' and send the issue to the arbitrator to decide." *Bosse v. N.Y. Life Ins. Co.*, 992 F.3d 20, 27-28 (1st Cir. 2021) (quoting *Schein*, 586 U.S. at 65-69). Because of the Delegation Clause, even if the scope of the agreement is ambiguous, which it is not, "a court possesses no power to decide the arbitrability issue." *Schein*, 586 U.S. at 68.

### 3. CNB Has Not Waived Its Right to Arbitrate.

Finally, CNB did not waive its right to arbitrate Plaintiffs' claims. Generally, there is a "strong presumption *against* inferring waiver—so strong that any reasonable doubts as to whether a party has waived the right to arbitrate should be resolved in favor of arbitration." *Toddle Inn Franchising, LLC v. KPJ Associates, LLC*, 8 F.4th 56, 64 (1st Cir. 2021) (cleaned up). To determine waiver, courts generally review factors evidencing that the party invoking arbitration has already meaningfully engaged in the litigation through discovery, by waiting until the eve of trial to compel arbitration, or by filing a counterclaim. *See FPE Found. v. Cohen*, 801 F.3d 25, 29 (1st Cir. 2015)

(enumerating factors for finding waiver). Not one of the factors supports waiver here. At its earliest opportunity, CNB is moving to compel arbitration, along with its responsive pleading.

* * *

Succinctly, Plaintiffs Lessner and Moore contractually agreed to arbitrate any claims arising out of their respective relationships with CNB and waived their rights to participate in a class action lawsuit. Accordingly, under Supreme Court, First Circuit, and Law Court precedent, Defendant CNB respectfully requests that this Court enter an Order staying this matter and compelling Plaintiffs to arbitrate their individual claims against CNB pursuant to the FAA. *See Concepcion*, 563 U.S. at 346; *Toth*, 118 F.4th at 410; *Sarchi*, 2022 ME 8, 268 A.3d 258.

## II. ALTERNATIVELY, THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS.

### A. Facts as Alleged in Amended Complaint

CNB is a national bank based in Camden, Maine, which "operates and encourages its customers to use" the Website, on which customers can access their account information, CNB's financial services, and apply for products like credit cards. *Id.* ¶¶ 2, 18, 29. Anyone can access CNB's Website on the Internet. *See id.* Plaintiffs allege that they are CNB customers who used the Website "to facilitate [their] financial services with Defendant and inputted Personal and Financial Information into Defendant's Website at Defendant's direction and encouragement." *Id.* ¶¶ 134-40. Plaintiffs do not allege what specific information they input via the Website. *See id.*

Plaintiffs allege that CNB installed third-party "online tracking technology onto its Website to gather and share information about Customers." *Id.* ¶ 30. Since 2010 or 2020,[5] CNB allegedly installed trackers owned by several companies, including Meta and Google. *Id.* ¶¶ 40-62, 65. These trackers allegedly "gather[] a vast assortment of Customer data" and transmit that data to third

[5] *Compare* Compl. ¶ 65 (stating CNB has installed trackers "at least as early as January 1, 2010"), *with id.* ¶ 67 (stating that CNB has installed trackers "since at least January 1, 2020.").

parties, who may sell the data to fourth parties. *Id.* ¶¶ 5, 33-39. Plaintiffs do not identify any "fourth parties" who received their data. *See id.* The types of data that Plaintiffs allege to have been disclosed through the trackers include "information related to account applications, including the fact that a user was on a certain page, that users clicked certain buttons and what URLs or webpages it led to, their status as a customer, the type of bank account they were opening, and the Customer's business structure." *Id.* ¶¶ 4, 151; *see id.* ¶¶ 77-99. Plaintiffs do not allege that CNB disclosed their account numbers, social security numbers, or similar sensitive information. Plaintiffs allege in conclusory fashion that after their data was disclosed to third parties, they received targeted advertisements "on social media for different banks and applying for cards." *Id.* ¶¶ 142, 154.

According to Plaintiffs, CNB did not disclose that its Website employed tracking technology to collect and disclose their data, and CNB did not seek consent to such collection and disclosure. *Id.* ¶¶ 100, 108-10. Plaintiffs cite to a handful of general provisions from various CNB contracts, including the "Online Services Privacy Policy," the "Privacy Policies," the "Terms of Use," and the "Privacy Notice," *id.* ¶ 103,[6] which Plaintiffs posit support their claim that CNB vowed without exception to protect their "Personal and Financial Information." *Id.* ¶¶ 102-07.

Contrary to Plaintiffs' assertions, however, the Online Services Privacy Policy discloses that CNB "collect[s] information from and about users of our Online Services," including that CNB may "use technology to automatically collect" details about the customer's usage of the Online Service and the customer's device information. Compl. Ex. A at 2-3. The same policy also states that CNB uses "information collection technologies" including Cookies and Web Beacons. *Id.* at 3-4. It identifies how customers can "control certain uses and disclosures" of information, including setting up a web browser to disable "tracking technologies." *Id.* at 5-6. Similarly, CNB's

[6] The Court may consider these documents on a motion to dismiss because they are central to the Plaintiffs' claims and documents referred to in the Complaint. *See Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 72 (1st Cir. 2014).

"Privacy Policies" state that CNB "collect[s] non-personal information and data automatically through the standard operations of our Internet servers or through the use of 'cookies,'" which CNB discloses it may use to "track usage behavior and compile aggregate data, thus allowing content improvements and targeted advertising." Compl. Ex. B at 1-2.[7]

Despite CNB's disclosures, Plaintiffs assert on behalf of themselves and a putative class that CNB is liable under eleven causes of action: negligence; invasion of privacy; breach of express and implied contract; unjust enrichment; bailment; declaratory judgment; violation of Maine's Confidential Financial Records Act ("CFRA"), 9-B M.R.S. § 161, *et seq*.; violation of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1); violation of the ECPA, § 2511(3)(A); violation of the Stored Communications Act, 18 U.S.C. § 2702; and violation of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030. Compl. ¶¶ 178-301. Plaintiffs allege they were harmed by "loss of privacy," "unauthorized" disclosure of information, receiving targeted advertisements, "decreased value" of their information, "increased risk of future harm," and "emotional distress." *Id.* ¶ 154. Because Plaintiffs lack Article III standing to assert such claims *and* because each of the claims fails on its merits, dismissal is warranted.

**B. Legal Standard**

In a class action, the named plaintiff "must allege and show that [he] personally ha[s] been injured, not that injury has been suffered by other, unidentified numbers of the class to which they belong and which they purport to represent." *Warth v. Seldin*, 422 U.S. 490, 502 (1975). If the named plaintiff cannot establish the requisite injury-in-fact, "none may seek relief on behalf of himself or any other member of the class." *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). The

[7] Curiously, the Exhibits Plaintiffs appended to their Complaint have watermarks or other annotations over certain key provisions of various CNB policies on which Plaintiffs rely. For clarity and convenience of the Court, Defendants resubmit those identical documents herewith, without those watermarks and annotations, which obscure certain relevant provisions. Cifaldo Dec. ¶¶ 46-48, Exs. E-G.

requisite injury for Article III standing bears on the Court's subject matter jurisdiction and is therefore subject to challenge under Federal Rule of Civil Procedure 12(b)(1).[8]

Moreover, Federal Rule of Civil Procedure 12(b)(6) requires Plaintiffs to allege "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Plausibility" is not demonstrated through "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555. Nor is it demonstrated through "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. Instead, plausibility requires Plaintiffs to plead "factual content that allows the court to draw the reasonable inference that [CNB] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mere conclusory statements do not suffice. *Id.* And, although the Court must, for the purposes of this Motion, "take all of the factual allegations in the complaint as true," it is not similarly bound with regard to "a legal conclusion couched as a factual allegation[.]" *Id.*

**1. Dismissal is Warranted Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for Failure to Plead Legally Cognizable Injury.**

Dismissal is warranted because Plaintiffs fail to plead a legally cognizable injury, and thus Plaintiffs lack Article III standing to assert their claims. Even were this Court to conclude Plaintiffs have crossed the standing threshold, Plaintiffs still fail to adequately plead cognizable injury for these causes of action.[9] *See Attias v. CareFirst, Inc.*, 365 F. Supp. 3d 1, 9 (D.D.C. 2019) ("Plaintiffs may satisfy the Article III injury-in-fact requirement and yet fail to adequately plead damages for a particular cause of action.").

---

[8] The "irreducible constitutional minimum" of Article III standing has three elements: (1) "injury in fact—an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent"; (2) "a causal connection between the injury and the conduct complained of"; and (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

[9] *See Gonzales v. Sweetser*, 2020 WL 6596389, at *4 (Me. B.C.D. Oct. 13, 2020) (negligence); *Nelson v. Me. Times*, 373 A.2d 1221, 1223 (Me. 1977) (privacy); *Tobin v. Barter*, 2014 ME 51, ¶ 10, 89 A.3d 1088 (contract); *Paffhausen v. Balano*, 1998 ME 47, ¶ 7, 708 A.2d 269 (unjust enrichment); *Motor Fin. Co. v. Noyes*, 139 Me. 159, 28 A.2d 235 (1942) (bailment); 18 U.S.C. § 2707(c) (Count X); 18 U.S.C. § 1030(g) (Count XI).

Plaintiffs' conclusory allegations of injury are premised on Plaintiffs' "increased risk of future harm," unsupported and speculative allegations of "decreased value" in Plaintiffs' "Personal and Financial Information," and harm from receiving targeted advertisements allegedly as a result of CNB's alleged tracking technologies. Compl. ¶ 154. With respect to Plaintiffs' conclusory allegations of risk of future harm, the First Circuit has held that a risk of future injury is insufficient to establish standing in the data privacy context. *Katz v. Pershing, LLC*, 672 F.3d 64, 79-80 (1st Cir. 2012) (affirming dismissal for lack of standing where claim rested "entirely on the hypothesis that at some point an unauthorized, as-yet unidentified, third party might access her data and then attempt to purloin her identity."). Beyond constitutional infirmity, Maine's Law Court has held that "risk of future harm" is insufficient to state a legally cognizable claim. *In re Hannaford Bros. Co. Data Sec. Breach Litig.*, 2010 ME 93, ¶¶ 6, 8, 4 A.3d 492.[10] And Maine's Business and Consumer Court has dismissed similar claims on their merits with respect to allegations of "devalued" personal information on the ground that such allegations were—like here—entirely conclusory. *Gonzales*, 2020 WL 6596389, at *4.[11]

Although the First Circuit has yet to weigh in on whether receiving targeted advertisements can qualify as a cognizable injury—for Article III standing or on the merits—federal courts around the country have dismissed identical claims on similar facts. *See, e.g.*, *T.D. v. Piedmont Healthcare, Inc.*, 2024 WL 3972984, at *3 (N.D. Ga. Aug. 28, 2024) ("No facts are alleged that would explain how receiving targeted advertisements from Facebook … would plausibly cause

---

[10] Applying *Hannaford*, the Maine Business and Consumer Court has dismissed numerous data privacy cases alleging risk of future injury or devaluation of personal information on the grounds that plaintiffs failed to allege cognizable injury. *See, e.g.*, *Gonzales*, 2020 WL 6596389, at *4; *Chabot v. Spectrum Healthcare Partners, P.A.*, 2021 WL 659565, at *1 (Me. B.C.D. Jan. 14, 2021); *Bathe v. KeyBank N.A.*, 2021 WL 6125321, at *2-3 (Me. B.C.D. Nov. 23, 2021).

[11] *But see Jane Doe v. Eastern Me. Healthcare Sys* ("*EMHS*")., Docket No. BCD-CIV-2024-31 (Me. B.C.D. Jan. 9, 2025) (Ex. B) (declining to apply *Hannaford* to dismiss case in a tracking technology matter involving disclosure of medical information, despite recognizing that the plaintiff "articulated her harm in a somewhat conclusory manner" and that "[s]ome of the damages Plaintiff has alleged are barred by *Hannaford*").

any of the Plaintiffs to suffer these damages."); *Cousin v. Sharp Healthcare*, 2023 WL 4484441, at *3 (S.D. Cal. July 12, 2023) (dismissing similar claims in the healthcare context when plaintiffs' allegations regarding the tracking and transfer of plaintiffs' medical information to Meta were "conclusory and devoid of any factual support"). This Court, too, should hold that such allegations are insufficient: Plaintiffs fail to specify what information was allegedly disclosed to Meta or Google, or that anyone at Meta or Google viewed or did anything with their information.[12]

Trying to obscure the fatal reality that *Plaintiffs* have not alleged any facts to support cognizable injury, Plaintiffs impermissibly hide behind "[a] list of horribles" that may befall the putative class. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 732-33 (1st Cir. 2016). All of Plaintiffs' allegations "are uncertain, contingent, or speculative." *Culebra II, LLC v. River Cruises & Anticipation Yachts, LLC*, 564 F. Supp. 2d 70, 77 (D. Me. 2008). Not one of the 301 allegations pleaded sheds any light on how *Plaintiffs* were actually harmed by anything that can be plausibly traced to CNB or its Website. "[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist." *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976). Had Plaintiffs suffered any actual harm from their use of CNB's Website, they would have alleged it.[13] Failing to do so, dismissal is warranted.

**2. Dismissal is Warranted for Failure to Plausibly Connect CNB's Use of Tracking Technologies to Disclosure of Plaintiffs' Information.**

Recently, the U.S. District Court for the District of New Jersey dismissed a case filed against TD Bank that had nearly identical allegations as those asserted against CNB, holding the

---

[12] The only *factual* support for Plaintiffs' "harm" is that they received ads related to bank products after visiting the Website. Compl. ¶ 142. However, there are no facts connecting their alleged receipt of ads to any of their Website activity. *See id.* ¶¶ 134-42. Indeed, Plaintiffs allege that they received ads for "*different* banks." *Id.* (emphasis added).

[13] Plaintiffs' alleged injury from "emotional distress" cannot save Plaintiffs' claims because they have not pleaded an intentional or negligent infliction of emotional distress claim, or any other legally cognizable damages allowing emotional distress to "tack on." *Curtis v. Porter*, 2001 ME 158, ¶ 19, 784 A.2d 18.

plaintiff failed to provide "well-pled allegations as to what personal financial information *belonging to Plaintiff* was allegedly improperly disclosed." *Stevens v. TD Bank. N.A.*, Docket No. 24-cv-08311-RMB-AMD (D.N.J. June 27, 2025) (Ex. 1). This Court should conclude the same.

Like here, the *Stevens* plaintiff alleged that TD Bank used tracking technologies to collect and disclose customers' financial information to Meta. *Id.* at 2. The *Stevens* court held that plaintiff's claims failed because he relied on generalized allegations of what tracking technologies may do, and not what information *specific to him* was disclosed. *Id.* at 9. ("No doubt the Complaint describes the functionality of the Pixel in considerable detail. But Plaintiff's case cannot ride solely on the general or theoretical capabilities of the Pixel. The Pixel must have captured and disclosed *his* personal financial information to state a claim."). The court held that the alleged disclosure of "'personal financial information'—with no further elaboration as to the nature of the information—is simply too conclusory to state a claim." *Id.* at 13.

Plaintiffs' allegations here are equally deficient. Plaintiffs allege generally what types of customer information may be disclosed through trackers, and spill the majority of their ink alleging what trackers generally are and how they work. Compl. ¶¶ 1-133. There are only 23 out of the 301-paragraph Complaint relating to *Plaintiffs'* specific experiences, and there, although both allege that they "inputted Personal and Financial Information" on CNB's Website, they nowhere specify *what* that information was. *Id.* ¶¶ 136, 140. As in *Stevens*, "Plaintiff's failure to 'explain the nature of the personal financial information allegedly captured by Meta Pixel [or other trackers]' is fatal to each of his claims." *Stevens*, Ex. 1 at 14. On this basis, too, dismissal is proper.

**3. Plaintiffs' Claims Fail on the Merits**

In addition to the fatal deficiencies discussed *supra*, Plaintiffs' claims all fail on the merits.

*Negligence (Count I):* To the extent that Plaintiffs premise their negligence claim on the

theory of "negligence *per se*," Compl. ¶¶ 185-89, "Maine does not recognize the doctrine of negligence *per se*," *Binette v. Dyer Libr. Ass'n*, 688 A.2d 898, 904 (Me. 1996), requiring dismissal. Even absent reliance on that doctrine, CNB is unaware of any common law duty of care owed by a financial institution related to browsing activity on its publicly available website, particularly where the company discloses to its customers or the general public that it collects and uses such data. *See generally supra*. Indeed, there is no "indication in Maine law that Maine would recognize a tort of negligent disclosure of . . . information apart from the tort of invasion of privacy." *Hudson v. S.D. Warren Co.*, 608 F. Supp. 477, 481 (D. Me. 1985). Count I should be dismissed.

*Invasion of Privacy (Count II):* To state such a claim, "Plaintiff must allege that publicity was given to facts about Plaintiff's private life that would be highly offensive to a reasonable person and that are not of legitimate concern to the public." *Hudson*, 608 F. Supp. at 479. It is not enough "to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons." *Stokes v. Barnhart,* 257 F. Supp. 2d 288, 295 (D. Me. 2003); *see Rush v. Me. Sav. Bank*, 387 A.2d 1127, 1128 (Me. 1978). And even where publicity is met, not all disclosures are actionable: "[t]he law is not for the protection of the hypersensitive." *Sandler v. Calcagni*, 565 F. Supp. 2d 184, 197 (D. Me. 2008).

There are no factual allegations of publicity here. Plaintiffs allege that CNB disclosed information to Facebook, Google, and potentially others.[14] Compl. ¶¶ 1, 31. Even if true, Maine law requires more. *Stokes*, 257 F. Supp. 2d at 295. Publication to a "finite number of individuals" comprising an entire company cannot "constitute the 'public' for purposes of this kind of invasion of privacy[.]" *Curtis v. Ryder Truck Rental, Inc.*, 2006 WL 662395, at *8 (D. Me. Mar. 13, 2006).

[14] Plaintiffs assume "on information and belief" that CNB uses a variety of trackers on its Website, but only identify specific trackers from two entities: Facebook and Google. Compl. ¶¶ 42-62.

Indeed, Plaintiffs do not allege that *anyone* actually saw their information. Moreover, as a matter of law, a person of "ordinary sensibilities" would not consider the transfer of Plaintiffs' browsing activity on CNB's public Website to third parties as "highly offensive." *See United States v. Forrester*, 512 F.3d 500, 510 (9th Cir. 2008) ("[E]-mail and Internet users have no expectation of privacy in the to/from addresses of their messages or the IP addresses of the websites they visit because they should know that this information is provided to and used by Internet service providers"). Instead, "data collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022). Count II should be dismissed.

*Breach of Contract (Count III):* Plaintiffs allege that they entered into contracts with CNB and that CNB "agreed to safeguard and protect Plaintiffs' and Class Members' Personal Financial Information." Compl. ¶ 211. They conveniently ignore that CNB explicitly discloses that its Website employs the very technologies that Plaintiffs assert were "hidden." The Online Services Privacy Policy discloses that CNB uses "information collection technologies" including Cookies and Web Beacons, Compl., Ex A at 3-4, and identifies how customers can "control certain uses and disclosures of your information," including disabling "tracking technologies," *id.* at 5-6. The "Privacy Policies" discloses that CNB "collect[s] non-personal information and data" through its Internet servers "or through the use of 'cookies.'" Compl., Ex. B at 1-2; *see id.* (disclosing that CNB may "track usage behavior and compile aggregate data, thus allowing content improvements and targeted advertising."). Both policies state that a customer's continued use of the Website means the customer accepts the terms of the policies. Compl., Ex. A at 1-2; *Id.*, Ex. B at 2-3. In short, CNB discloses that it collects certain data about the customer's use of the Website; that the customer can disable such collection; and that CNB uses such data for targeted ads.

Despite these disclosures, Plaintiffs allege that they had no way of knowing that the Website contained tracking technology. *See* Compl., ¶ 7. Plaintiffs point to general provisions of these documents to argue that CNB promised to "preserve the security and privacy of Customers' Personal and Financial Information." *Id.* ¶¶ 102-07. Nowhere do Plaintiffs acknowledge the specific disclosures cited above. Instead, Plaintiffs rely on CNB's assertions that it will protect customers' "personally-identifiable information" and "personal and financial information." *Id.* IP addresses alone do not rise to this level, and Plaintiffs do not allege (nor did it occur) that CNB disclosed their bank account numbers, social security numbers, or similar sensitive information. Plaintiffs' claims are barred by CNB's clear disclosures. *See Shah v. Capital One Fin. Corp.*, 768 F. Supp. 3d 1033, 1050 (N.D. Cal. 2025) (dismissing claim in similar case where plaintiff did "not cite where in the contract Defendant agreed to protect their nonpublic personal information or when Defendant explicitly promised not to disclose their data."). Count III should be dismissed.

*Unjust Enrichment (Count IV)*: Plaintiffs allege that they entered into a contract with CNB. Compl. ¶¶ 210-12. Although unjust enrichment claims may be maintained in the alternative if the existence of an enforceable contract is disputed, *see June Roberts Agency, Inc. v. Venture Props, Inc.*, 676 A.2d 46, 49 n.1 (Me. 1996), a plaintiff cannot maintain an unjust enrichment claim if there is no question that an express contract governs the relevant conduct, *see York Cty. v. PropertyInfo Corp.*, 2019 ME 12, ¶ 26, 200 A.3d 803 ("no dispute" over existence of express contract "precludes the availability of any recovery in equity for unjust enrichment"). Because CNB does not dispute that Plaintiffs' claims are governed by the express terms of a valid contract, no claim for unjust enrichment can proceed. Count IV should be dismissed.

*Bailment (Count V):* Plaintiffs fail to allege the bare minimum to sustain a bailment claim: an agreement with CNB that Plaintiffs' web browsing information would be returned to them or

that they demanded that CNB redeliver their web browsing information. *See* Compl. ¶¶ 226-231; *Daigle v. Pelletier*, 139 Me. 382, 31 A.2d 345, 346 (1943); *Chabot*, 2021 WL 659565, at *7 ("When the personal item is delivered to, accepted, and controlled by a defendant, there *must* be a demand for return for the personal property."). Count V should be dismissed.

*Declaratory Judgement (Count VI)*: A declaratory judgment is not an independent cause of action. *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007). Thus, the Court should dismiss Count VI because it is "entirely duplicative" of Plaintiffs' other claims and "superfluous." *Zajac, LLC v. Walker Industrial*, 2016 WL 3962830, at *7 (D. Me. July 21, 2016).

*Violation of Maine's CFRA (Count VII):* Maine's CFRA does not provide for a private right of action. *See* 9-B M.R.S. § 466. The statute describes the listed actions as "criminal offenses" and may only be challenged by the state's prosecutorial authority. *Id.* In a similar case, the Maine Business and Consumer Court refused to allow a plaintiff to add a claim under 9-B M.R.S. § 162 because it did not contain a private right of action expressly or by implication. *Bathe v. Key Bank*, 2021 WL 5167677, at *1 (Me. B.C.D. Sept. 29, 2021). The same rationale applies here. *Id.*; *see Wawenock, LLC v. Dep't of Transp.*, 2018 ME 83, ¶¶ 6, 27, 187 A.3d 609 ("When a private right of action exists . . . it is most often created by express language."). Count VII should be dismissed.

*Violation of Federal Laws (Counts VIII-XI):* Plaintiffs assert various federal statutory claims under the ECPA (Counts VIII & IX), the Stored Communications Act ("SCA") (Count X), and the CFAA (Count XI). With respect to the ECPA, CNB cannot be found liable for the interception of an electronic communication if it "is a party to the communication or where one of the parties to the communication has given prior consent," so long as such interception is not "for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). This exemption applies to CNB. *See Allen v. Quicken Loans Inc.*, 2018 WL 5874088, at *4-7 (D.N.J. Nov. 9, 2018)

(dismissing data privacy case against financial company after finding that exemption applied). Plaintiffs allege that they transmitted information to the Website, making CNB a party to the alleged communication, *see* Compl. ¶¶ 34, 37-38, 134-140,[15] and Plaintiffs have not sufficiently alleged that CNB's *purpose* of using Plaintiffs' data was to commit a tortious act. *See Allen*, 2018 WL 5874088, at *6 ("Indeed, there are 'no facts pleaded to indicate that the interceptions in this case were motivated by anything other than Defendants' desire to monetize Plaintiffs' use of the Quicken Website, and thus the 'criminal or tortious act' exception embodied in § 2511(2)(d) is inapplicable."). Counts VIII and IX should be dismissed.

Plaintiffs' SCA and CFAA claims fare no better. To assert an SCA claim, Plaintiffs must sufficiently allege that CNB is an "electronic communication service," defined as "any service which provides to users thereof the ability to send and receive wire or electronic communications." 18 U.S.C. § 2510(15). CNB "is not an electronic communication service because its website does not allow customers to send and receive messages to third parties." *Shah*, 768 F. Supp. 3d at 1042-43.[16] To assert a viable CFAA claim, Plaintiffs must allege a loss equal to or less than $5,000, which Plaintiffs fail to allege with any specificity. *Id.* (dismissing CFAA claim in similar circumstances because "Plaintiffs allege in a conclusory manner that Defendant's conduct caused loss of $5,000 in value for Plaintiffs, but never state how to value the loss."). For the same reasons as those in *Shah*, Counts X and XI should be dismissed.

## CONCLUSION

For these reasons, CNB respectfully requests that this Court stay this case and compel arbitration. Barring that result, CNB seeks dismissal of Plaintiffs' Amended Complaint.

---

[15] Further, Plaintiffs consented to CNB's receipt of the data by continuing to use the Website. *See* Ex. C.

[16] Similarly, Count IX requires Plaintiffs to show that CNB is an "electronic communication service," 18 U.S.C. § 2511(3)(a), and thus should be dismissed on this basis, as well.

Dated: July 28, 2025

/s/ *Sara A. Murphy*
Lucus A. Ritchie
Sara A. Murphy
Pierce Atwood LLP
Merrill's Wharf, 254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1100
lritchie@pierceatwood.com
smurphy@piercetwood.com

*Attorneys for Defendant Camden National Bank*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 28, 2025, I electrically filed the foregoing document using the CM/ECF system which will send notification of such filing to counsel of record.

Date: July 28, 2025

/s/ *Sara A. Murphy*

Sara A. Murphy
Pierce Atwood LLP
Merrill's Wharf
254 Commercial Street
Portland, ME 04101
Tel: (207) 791-1173
smurphy@pierceatwood.com